No. 61,272

KENNEDY & MITCHELL, INC., *Appellant,* v. ANADARKO PRODUCTION COMPANY, *Appellee.*

(754 P.2d 803)

Opinion filed April 29, 1988.

*Bruce M. Daniel,* of Albright & Welch, P.C., of Tulsa, Oklahoma, argued the cause, and *Stanley E. Antrim,* of Yoxall, Antrim, Richardson & Yoxall, of Liberal, was with him on the brief for appellant.

*Robert J. O'Connor,* of Hershberger, Patterson, Jones & Roth, of Wichita, argued the cause, and *David E. Bengtson,* of the same firm, and *Clarence A. Conoley,* of Anadarko Production Company, of Kansas City, Missouri, were with him on the brief for appellee.

The opinion of the court was delivered by

McFARLAND, J.: This is a declaratory judgment action seeking a judicial determination of the effect of a "market-out" provision in a gas purchase contract. The district court held the contract was clear and unambiguous and that the defendant-purchaser's actions in lowering the price paid for the gas were authorized by the contract. Plaintiff-seller appeals from the summary judgment entered in favor of the defendant-purchaser.

The facts pertinent to the controversy herein are not materially disputed and are set forth in the district court's journal entry of judgment as follows:

"1. On November 6, 1980, APC [Anadarko Production Company] and KMI [Kennedy & Mitchell, Inc.] entered into the Gas Purchase and Sales Agreement ('the Contract') in issue. Thereby APC agreed to purchase and KMI agreed to sell the natural gas produced from the Morrow formation of the Liberal No. 29-189 well located in the Southeast Quarter (SE/4) of Section 4, Township 35 South, Range 33 West, Seward County, Kansas.

"2. Article X of the Contract concerns the price to be paid and accepted for the aforesaid gas. Specifically, Section 10.3 of the Contract, the 'market-out clause', states that;

'In the event Buyer finds the price of gas sold under this contract to be uneconomical and unacceptable, the Buyer shall propose to Seller a lesser and acceptable price level. Seller shall have a period of thirty (30) days following said notice to either accept or reject Buyer's offer. If Seller rejects Buyer's offer, then Buyer shall release Seller's gas from the terms of this contract.'

"3. Article XIV of the Contract concerns billing and payment for gas sold and purchased under the Contract. Specifically, Section 14.6 of the Contract states:

'Each party hereto shall have the right at reasonable times to examine the books and records of the other party to the extent necessary to verify the accuracy of any statement, charge, computation, or demand made under or pursuant to this Agreement.'

"4. By letter dated February 12, 1985, APC notified KMI that, pursuant to Section 10.3 of the Contract, the price of gas under the Contract would be adjusted to $2.70 per MMBTU, inclusive of adjustments, less the Cimarron River System Cost of Service (hereafter 'CRSCOS'). KMI was allowed thirty days to either accept this redetermined price or to cancel the Contract.

"At the time it issued this letter, APC was paying KMI a contract price based on the NGPA [Natural Gas Policy Act] § 103 price. Thereafter, APC paid a contract price based on the price described in that letter until that letter was modified.

"5. By letter dated March 11, 1985, KMI notified APC that it rejected APC's price redetermination, but reaffirmed the Contract and requested payment for the gas sold under the Contract at the published NGPA § 103 price pursuant to Section 10.1 of the Contract.

"6. By letter dated May 6, 1985, APC reaffirmed its prior price redetermination as set forth in its letter of February 12, 1985, and offered KMI another thirty-day period to either accept the redetermined price or to cancel the Contract.

"7. APC received no response from KMI to its price redetermination offer and concluded that KMI had elected to terminate the Contract. By letter dated July 9, 1985, APC submitted a Cancellation Agreement to KMI for its execution.

"8. By letter dated August 5, 1985, counsel for KMI denied APC's contractual

authority to redetermine the price of gas under the Contract, demanded payment therefore at the current published NGPA § 103 price, and demanded payment for the incremental difference between the Section 103 price and the price paid to KMI since APC's price redetermination.

"9. By letter dated August 13, 1985, counsel for KMI requested the opportunity to examine APC's books and records to verify the accuracy of APC's statement that gas purchased from KMI pursuant to the Contract is actually uneconomical.

"10. By letter dated September 3, 1985, APC refused to allow KMI to examine APC's books and records as KMI had requested.

"11. By letter dated October 17, 1985, APC notified KMI that, pursuant to Section 10.3 of the Contract, the current price of gas under the Contract was uneconomical and unacceptable and would be adjusted effective December 1, 1985, to $2.25 per MMBTU, inclusive of adjustments, less the CRSCOS. KMI was allowed thirty days to either accept this redetermined price or to cancel the Contract. After its issuance of this letter, APC paid KMI a contract price based on the price described in that letter, until that letter was modified. KMI did not respond to APC's October 17, 1985 letter.

"12. KMI filed this action on or about March 18, 1986."

## The trial court then concluded:

"1. The central issue in this matter is whether Section 10.3 of the Contract is compatible with Section 14.6, or whether the Contract should be construed [to be] ambiguous. The Court concludes: that the Contract is not ambiguous; that Section 10.3 grants APC, as the Buyer, the unilateral right to determine that a current price is uneconomical and unacceptable; and that the provisions of Section 14.6 apply to all of the other provisions of the Contract except Section 10.3, which requires the aforesaid unilateral determination. The briefs of APC are specifically incorporated into this Journal Entry.

"2. On three separate occasions, APC determined that the price of gas under the Contract was uneconomical and unacceptable to it. APC submitted a lower price to KMI, and offered to cancel the Contract if the price [was] not acceptable to KMI.

"APC's actions were expressly authorized by Section 10.3 of the Contract. That clause clearly grants APC the right unilaterally to lower the price paid for gas sold under the Contract. APC's unilateral actions lawfully and effectively lowered the Contract price. APC is entitled to summary judgment as a matter of law. KMI's Cross-Motion for Summary Judgment is denied."

KMI appeals from the entry of summary judgment in favor of APC. KMI's position may be summarized as follows:

1. The contract is clear and unambiguous;

2. the market-out clause grants APC the right to lower the price only if the existing price is provably uneconomical;

3. "uneconomical" means APC is losing money in its sale of the gas purchased under the contract and the burden of proof of same is on APC;

4. KMI has the right to inspect APC's books and records pursuant to Section 14.6 of the contract to determine whether the existing purchase price is, in fact, uneconomical and, accordingly, whether or not the market-out clause has been triggered;

5. the district court erred in construing the disputed contractual provisions adversely to the position of KMI; and,

6. as a fall-back position, the contract is ambiguous and should be construed strictly against APC, its scrivener.

The construction of a written instrument is a question of law, and the instrument may be construed and its legal effect determined by an appellate court. *Peterson v. Midland Nat'l Bank,* 242 Kan. 266, Syl. ¶ 1, 747 P.2d 159 (1987). Whether an ambiguity exists in a written instrument is a question of law to be decided by the court. *Holly Energy, Inc. v. Patrick,* 239 Kan. 528, 534, 722 P.2d 1073 (1986). Language in a contract is "ambiguous" only when words used to express the meaning and intention of the parties are insufficient in that the contract may be understood to reach two or more possible meanings. *Havens v. Safeway Stores,* 235 Kan. 226, 231, 678 P.2d 625 (1984).

The district court held that the market-out clause herein granted APC the unilateral right to reduce the price paid, leaving KMI with only the option of accepting the reduction or canceling the contract. KMI argues this is an unfair, unreasonable, and improper interpretation of the contract. On first impression, this argument has some appeal. Article X of the contract spells out how the price of the gas is to be determined under controlling regulation and in the absence of such regulation. Unilateral reduction of the price to be paid under Section 10.3 would appear to be inconsistent with the entire pricing scheme contained in Article X. Closer scrutiny and our research leads us to conclude otherwise.

A number of legal treatises and commentators have discussed market-out clauses. The term "market-out clause" as applied to a gas purchase price permits a pipeline purchaser to lower its price if market conditions dictate. The well owner is allowed to reject the lower price and have the pipeline transport the gas to another buyer. 8 Williams and Meyers, Oil and Gas Law 547 (1987). Another learned treatise states:

" 'Market-out' clauses allow the *purchaser* to reduce the price it pays whenever it determines that the market into which it sells will not bear the currently-demanded price. The 'market-out' clause may be tied to a price determined by the price of an alternate fuel, e.g., '85% of the monthly average cost of Number 2/diesel, as used in the * * * area,' *or may be subject solely to the buyer's opinion.* The *seller* is given the options of accepting the reduced price or cancelling the contract . . . ." Hemingway, Law of Oil and Gas 362 (1983). (Emphasis supplied.)

Likewise, legal commentators place the authority to invoke the market-out clause unilaterally with the buyer, unless the market-out clause spells out specific restrictions. See Turner, "Natural Gas—Impact of Deregulation or Reregulation on Sales Contracts," 29 Rocky Mtn. Min. L. Inst. 501, 521 (1983).

Johnson, "Natural Gas Sales Contracts", 34th Oil & Gas Inst. 83, 104-05 (Mathew Bender 1983), discusses market-out clauses as follows:

"The basic theory of these clauses is to permit the pipeline to reduce the contract price paid the producer if the pipeline's weighted average cost of purchased gas, plus its transportation costs and return, exceed the market price of alternate fuels in its market area. The clause takes many different forms, varying all the way from unfettered discretion in the pipeline to reduce its price, to specific parameters under which the clause can be invoked coupled with the right in the producer to cancel the contract and resell to other parties utilizing the pipeline buyer's transportation system at standard rates. The following elements require careful consideration in such a clause:

(1) The condition precedent which allows the pipeline to invoke the clause; the better clauses should provide for comparison between the particular pipeline tariff which competes with a particular alternate fuel in a particular market area (*i.e.,* the price of No. 6 fuel oil in Minneapolis, Minnesota). Ideally, a pipeline should not be permitted to trigger the clause to avoid fuel switching by industrial customers to some fuel, such as oil or coal, which the national interest might favor.

(2) The clause should provide assurances that it will not be invoked selectively by the pipeline to drive down some prices while leaving other higher prices intact (*e.g.,* the prices paid to the pipeline's affiliates). The pipeline should also be prevented from entering into new contracts at     prices higher than those levels which it places in effect under the market-out clause.

(3) The producer should have the *unfettered* right to cancel the contract and resell the gas to another purchaser rather than accept the reduced price. This right should include:

(a) The absence of any 'back-in' or right of first refusal in the original purchaser;

(b) Sufficient time to look for another purchaser before electing to accept

the price or cancel the contract; and

(c) The use of the pipeline's facilities (at standard rates) to transport the gas to the new buyer.

"Strong efforts are expected in the next Congress to impose some type of 'market-out' clause in all contracts by legislative fiat. There is great danger that Congress will overreact and impose a 'solution' which will exacerbate, rather than reduce, the market ordering problem."

Section 10.3 is iterated at this point for convenience, as follows:

"In the event Buyer finds the price of gas sold under this contract to be uneconomical and unacceptable, then Buyer shall propose to Seller a lesser and acceptable price level. Seller shall have a period of thirty (30) days following said notice to either accept or reject Buyer's offer. If Seller rejects Buyer's offer, then Buyer shall release Seller's gas from the terms of this contract."

There is nothing ambiguous in the language of Section 10.3. Clearly, provisions could have been placed in this market-out clause which would have restricted APC's right to invoke the clause. This was not done despite the fact that the contract negotiations extended over a period of some seven months. KMI's chief negotiator was Kenneth L. Peters, Vice-President of Operations for KMI. The parties to the contract stood on an equal footing in negotiating a contract within their field of expertise. KMI could have protected itself from the actions of APC to which it now objects. The rule of law in Kansas is that where parties have carried on negotiations, and have subsequently entered into an agreement in writing with respect to the subject matter covered by such negotiations, the written agreement constitutes the contract between them and determines their rights. *Hall v. Mullen*, 234 Kan. 1031, Syl. ¶ 3, 678 P.2d 169 (1984). See *Wood River Pipeline Co. v. Willbros Energy Services Co.*, 241 Kan. 580, 582, 738 P.2d 866 (1987).

The argument of KMI that Section 14.6 operates as a restriction on APC's right to invoke the market-out clause (Section 10.3) is without merit. Article XIV is entitled "Billing and Payment" and concerns the areas of its title—when payment for gas delivered is due and payable, how it is to be paid, etc. Section 14.6 simply authorizes each party to have access to each other's books and records to verify the "*accuracy* of any statement, charge, computation, or demand made under or pursuant to this Agreement." This clause cannot be construed as a restriction on the unfettered

unilateral right of APC to determine the price of the gas is "uneconomical and unacceptable" and propose a lower price as granted in Section 10.3. We conclude that the district court correctly held: (1) the contract was clear and unambiguous; (2) under Section 10.3 APC had the unilateral right to determine the price was "uneconomical and unacceptable" and propose a lower price; and (3) Section 14.6 is inapplicable to Section 10.3. KMI's "fall-back" position that the contract is ambiguous and should, therefore, be strictly construed against APC, its scrivener, is without merit as the contract has been determined to be clear and unambiguous.

The judgment is affirmed.