(760 P.2d 688)
No. 60,903

LAIRD NOLLER, *Appellant,* v. GMC TRUCK AND COACH DIVISION, GENERAL MOTORS CORPORATION, *Appellee.*

14

Opinion filed August 26, 1988.

*Charles D. McAtee, Anne L. Baker,* and *John D. Ensley,* of Eidson, Lewis, Porter & Haynes, of Topeka, for appellant.

*Robert J. Harrop,* of Gage & Tucker, of Kansas City, Missouri, *Stephen A. Murphy,* of Gage & Tucker, of Overland Park, and *Charles E. Fairfax, III,* and *Judith A. Zakens,* of General Motors Corporation, of Detroit, Michigan, for appellee.

Before DAVIS, P.J., LARSON and GERNON, JJ.

LARSON, J.: Laird Noller filed a breach of contract action against GMC Truck and Coach Division, General Motors Corporation (GMC) on the theory he was a third-party beneficiary of the franchise Dealer Sales and Service Agreement (DSSA) between GMC and Jay Beard Trucks, Inc. Noller also alleged GMC tortiously interfered with his prospective business advantage and with his contract with Beard to purchase Beard's assets conditioned upon his being approved as a GMC dealer. The trial court granted summary judgment to GMC on all three counts. Noller appeals.

Beard began business as the GMC truck dealer in Topeka in 1976. On November 1, 1980, GMC renewed Beard's DSSA,

which in paragraph Fourth, entitled "Changes in Management and Ownership," provides:

"If Dealer desires to make a change in its Dealer Operator(s) or ownership or sell its principal assets to a party that wishes to become an authorized dealer, Dealer will give General Motors prior written notice of the proposed change or sale. *General Motors shall not arbitrarily refuse to agree to such proposed change or sale.*

"Dealer agrees to provide in the form requested and in a timely manner all applications and information customarily requested by General Motors to evaluate the proposed change or sale. *General Motors agrees to consider all factors requested by Dealer and base its decision on whether the proposed change is likely to result in a successful dealership operation with acceptable management and ownership which will provide satisfactory sales and service for GMC Truck customers at the approved location.*"

Article III C of the agreement, entitled, "Other Changes in Management and Ownership or Sale of Assets," provides:

"In order for General Motors to effectively perform its responsibility to administer the authorized dealer system, Dealer agrees in Paragraph FOURTH to give General Motors prior written notice of any proposed change in its Dealer Operator(s) or ownership or any proposed disposition of its principal assets. In turn, *General Motors agrees to consider Dealer's proposal under the standards identified in Paragraph FOURTH and not to arbitrarily refuse to agree to such proposal. In determining whether the proposal is acceptable to it, General Motors will take into account the qualifications, personal and business reputation and financial standing of the proposed dealer operator and owners,* as well as General Motors' interest in promoting and preserving competition among General Motors dealerships, and between those dealerships and dealerships representing competing motor vehicle manufacturers.

"Dealer shall be notified in writing of General Motors' agreement or disagreement to Dealer's proposal within sixty days after Dealer has furnished all applications and information reasonably requested by General Motors to evaluate such proposals."

With respect to the rights of General Motors to select dealers, the agreement provides:

"General Motors has the right to select each successor and replacement dealer and to approve its owners and principal management and the location of its dealership facilities. *General Motors shall perform such responsibility as set forth in Paragraph FOURTH on the basis of evaluating each candidate's qualifications and proposal for the conduct of dealership operations against the standards set forth in this Agreement.*" (Emphasis added.)

On July 3, 1981, Jay Beard wrote to GMC's Kansas City zone manager advising that, as a result of severe economic difficulties, a depressed market, and health problems, it was his intent to sell the assets of Jay Beard Trucks, Inc. GMC acknowledged the

receipt of the July 3 letter and by a reply dated July 9, 1981, offered the following for Beard's guidance in the consideration of such sale:

"1. You have the right to sell the physical assets of your company at any time to anyone you wish on whatever basis you may negotiate.

"2. The sale of the assets of your company will necessarily result in the termination of the Dealer Sales and Service Agreement for GMC Truck Motor Vehicles in effect between us.

"3. The Dealer Agreement by its own terms is not transferable, assignable or saleable by a Dealer and conveys no property right to your company. GMC Truck retains the right to select and appoint each Dealer, *to approve its owners and principal management, and to do so on the basis of evaluating the candidate's qualifications and proposal.*

"4. General Motors has a policy that before prospective replacement dealer representation is considered, a review is made through the appropriate Divisional and Corporate levels of the continued viability of the particular dealer location, and the desirability of continuing dealer representation there. In your case, we anticipate completing that review in the near future and will advise you of our intentions with respect to our future representation at your location at that time.

. . . .

"6. GMC Truck does not become involved in negotiations between parties for the purchase and sale of physical assets of a Dealer. Our interest in this aspect of proposals submitted to us by otherwise acceptable franchise applicants is limited to an evaluation of the projected effect of proposed investments on the capital position of the proposed dealership, and on the projected return on investment.

"7. We recommend any agreement which you make for the sale of your company's assets should be conditioned upon the approval by GMC Truck of such party and his or her proposal for a Dealer Agreement." (Emphasis added.)

Beard first contacted Noller concerning the possible sale of Beard's assets in January of 1982. Noller has been an owner-operator of a Ford dealership in Topeka since 1974 and is one of the top 100 dealers in the United States for Ford automobiles and trucks. Noller also owns Laird Noller Toyota and Laird Noller Ford-Mazda in Lawrence, Kansas.

In the later part of January or early February of 1982, after continued negotiations with Noller, Beard went with Robert G. Tagtmeyer, GMC's district manager, to view Noller's dealership operations in Topeka. After it became apparent that an agreement could be reached with Noller, Beard arranged a meeting with Roger A. Ward, GMC's zone manager, and Tagtmeyer at GMC's office in Overland Park, Kansas. This meeting occurred February 19, 1982, and was instigated to obtain assurances from GMC that the Beard-Noller proposal would be a viable transac-

tion. Ward told Beard to complete the agreement with Noller and forward it for processing. Beard returned to Topeka and told Noller they had the "green light" to complete the buy-sell agreement.

On February 24, 1982, Noller and Beard entered into a buy-sell agreement for the purchase of Beard's dealership. In accordance with the suggestion of GMC in its letter of July 9, 1981, and the DSSA agreement between Beard and GMC, paragraph 11 of the Beard-Noller buy-sell agreement, entitled Conditions Precedent, provides: "The agreement is conditioned upon approval of this agreement by GMC Truck and Coach Division of General Motors Corporation, Pontiac, Michigan." Noller wanted this paragraph in the agreement to assure that he was "buying" the GMC truck franchise. He was not interested in purchasing Beard's dealership assets unless he could also obtain the GMC truck franchise.

On March 1, 1982, Beard submitted the buy-sell agreement to GMC for approval. Noller's understanding of the approval process was that Beard would present the agreement to GMC, who would contact Noller concerning his becoming a GMC franchisee. Noller's plans concerning the operation of the proposed franchise were flexible and he was willing to do whatever GMC requested in order to obtain the franchise. Noller was qualified based upon his strong financial condition and experience with seven other franchises.

Ward acknowledged receipt of the buy-sell agreement by a March 2, 1982, letter to Beard, which continued the same provisions as the earlier letter forwarded to Beard by GMC on July 9, 1981.

GMC never sent dealership transfer applications to Noller, never contacted Noller, never obtained any documentation or additional information from Noller, and never made any inquiry to Beard as to Noller's qualifications and plans. Nor did Noller make any attempt to furnish GMC with this information.

During contacts with Ward and Tagtmeyer, Beard was advised that approval had not been obtained. On May 6, 1982, Ward wrote Beard the following letter:

"This is to advise you that, after careful consideration, GMC Truck & Coach Division has decided not to approve execution of a General Motors Corporation Dealer Sales and Service Agreement for GMC truck vehicles for the Topeka,

Kansas dealership point in which Laird Noller would be dealer-operator or owner."

Discovery of GMC files revealed a "suggested letter" dated March 5, 1982, written by Ward to Beard advising of GMC's decision not to approve the transfer of the franchise to Noller. Discovery further revealed the regional or area manager comments on the dealer request for the Topeka area contained the notation dated March 11, 1982, stating, "I do not recommend dualing with Ford."

The record is clear that GMC made no investigation of Noller's qualifications, personal and business reputation, or financial standing, and appeared to deny the change solely on the grounds that he was involved in Ford dealerships.

Because of the failure to approve the granting of the GMC franchise, the buy-sell agreement between Noller and Beard was not performed.

In September of 1982, Beard sold his assets to Maurice Lombardo, an International Harvester dealer. GMC approved the transfer in December of 1982, after soliciting and receiving from Lombardo an application, financial information, a proposed dealer balance sheet, and plans for location of the dealership. In May of 1983, Lombardo notified GMC of his desire to sell the light truck line to Bill Kobach Buick, Inc. GMC subsequently approved the transfer. Kobach located the franchise at 21st and Topeka Boulevard, across the street from the location planned for sale of GMC trucks by Noller.

Noller estimated that he would have made net profits of $201,000 per year had he received the GMC truck franchise. He claimed this was a "very conservative" estimate. Noller's computations were based upon his estimated sales of GMC trucks, projected to be 25% of sales of Ford trucks which he regularly sold at a location one block away. Noller's estimate also relied upon past vehicle registrations of GMC, Chevrolet, and Ford vehicles. The intersection where Noller planned to place the GMC light-duty truck franchise has the second highest traffic count in the state.

Noller's action against GMC was filed in Shawnee County District Court on May 5, 1984. Noller's petition contained three counts: (1) Tortious interference with prospective business advantages which would have been acquired by Noller had he been permitted to buy and operate the GMC dealership; (2)

breach of GMC's express contractual obligation to consider a proposed franchisee's qualifications which resulted in damages to Noller as a third-party beneficiary; and (3) interference with the contractual relationship between Beard and Noller. Beard also sued GMC, and his suit is pending in the United States District Court for the District of Kansas, Case No. 83-4346. By stipulation of the parties, discovery in this action and the United States District Court action was consolidated.

In June of 1986, GMC filed a motion to dismiss, or in the alternative, for summary judgment with an accompanying Rule 141 (1987 Kan. Ct. R. Annot. 79) statement and memorandum of law. Following the filing of Noller's Rule 141 memorandum, brief in opposition, and oral arguments, the trial court by order dated April 14, 1987, ruled Noller was not a third-party beneficiary of the GMC-Beard contractual obligation that GMC would not arbitrarily object to the proposed franchisee and would specifically consider the proposed dealer's qualifications, personal and business reputation, and financial standing. The trial court also ruled Noller does not have a tort action against GMC, reasoning that Noller failed to properly show the essential elements of the tort of intentional interference with contractual relationship or prospective business advantage.

The issues on appeal are whether the trial court correctly determined that Noller was an incidental, but not an intended, beneficiary of the DSSA agreement between Beard and GMC, and whether Noller failed to develop the necessary elements of his tort claim.

*Is Laird Noller an intended beneficiary of the DSSA agreement between Beard and GMC?*

To focus on this issue it will be helpful to trace the history and identify the current status of Kansas law dealing with third-party beneficiaries.

Kansas law is in a state of transition between categorizing beneficiaries entitled to recover as either "creditor beneficiaries" or "donee beneficiaries" under the provisions of early case law and the Restatement of Contracts, and those classified as "intended beneficiaries," which was the more logical characterization suggested by Professor Arthur Corbin and adopted in the Restatement (Second) of Contracts. See Hunter, Modern Law of Contracts ¶ 23.03 (1987). The long-term battle between Pro-

fessor Williston (2 Williston on Contracts § 356-357 [1959]) and the view of the First Restatement and the modern view of Professor Corbin (4 Corbin on Contracts § 774 [1951]), which became the current law as recognized by the Second Restatement, is chronicled in detail in Waters, *The Property in the Promise: A Study of the Third Party Beneficiary Rule*, 98 Harv. L. Rev. 1111, 1165-1172 (1985).

The drafters of the Restatement (Second) of Contracts stated, "[T]he terms 'donee' beneficiary and 'creditor' beneficiary carry overtones of obsolete doctrinal difficulties." Restatement (Second) of Contracts § 302, Introductory Note (1981). The terms "intended" beneficiary and "incidental" beneficiary are now used to distinguish beneficiaries who have rights from those who do not. The focus is now on whether the promisor and the promisee intended to benefit a third party, regardless of the nature of the transaction. Restatement (Second) of Contracts § 302 states:

"§ 302. Intended and Incidental Beneficiaries

"(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

"(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

"(b) *the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.*

"(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary." (Emphasis added.)

Professor Hunter explains the reasoning which we must follow in making the critical decision as to whether a beneficiary is incidental or intended when he states:

"Intent is the critical factor, and the first question is whose intent. The second Restatement does not specifically define whose intent controls. It states only that the courts must 'effectuate the intention of the parties.' The majority of jurisdictions look to the promisee's intent. This is in accord with Professor Corbin's argument that the promisee's intent is the relevant one because the consideration received solely motivates the promisor. A minority of jurisdictions look to the promisor's intent.

"The next important question involves the nature of the intent. By far, the majority rule is that there must be some showing of an intent to benefit the third party. Some jurisdictions add a requirement of an intent to confer a right on the third party to enforce the agreement in addition to an intent to benefit. Many courts add this additional showing of an intent to confer a legal right or remedy in

cases involving government contracts with private agencies that benefit numerous parties.

"Because the promisee is not normally a party to the lawsuit and because the promisor has an interest in showing that there was no intent to benefit, determination of intent is not always easy. Courts have devised various tests and rules of thumb to determine whether an intent to benefit existed at the time when the parties executed a contract. Professors Calamari and Perillo have proposed a reasonable-person standard:

" 'Would a reasonable man in the position of the promisor conclude that the *promisee manifested an intention that the promisor's promised performance was* sought at least in part for the benefit of the alleged beneficiary, and, assuming that the answer to the first question is in the affirmative, would a reasonable man in the position of the promisee conclude that the promisor acquiesced in the intention of the promisee.' " Hunter, Modern Law of Contracts ¶ 23.03[4][a], pp. 23-12, 13.

## Professors Calamari and Perillo explain and justify their reasonable person standard as follows:

"It is obvious that not everyone who would be benefited by performance of a contract, however remotely or indirectly, should be permitted to enforce it. The test by which the line is ordinarily said to be drawn between protected and incidental beneficiaries is the test of 'intent to benefit' the beneficiary.

"Of whose intent do the courts speak and how is the intent to be ascertained? One view, distinctly in the minority, is that both parties must intend to benefit the third party and that such intention must be found in the contract. In general, however, the courts are agreed that it is the promisee's intention that is more important. Thus the original Restatement determines 'intent to benefit' by looking at the purpose of the promisee in the light of the terms of the promise and the accompanying circumstances.

"The Restatement Second takes the position that, 'unless otherwise agreed,' if 'recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties,' the beneficiary will be protected in two situations. First, if 'performance of a promise will satisfy an obligation of the promisee to pay money to a beneficiary.' Second, if 'the promisee manifests an *intention to give the beneficiary the benefit of the promised performance.* Ultimately, according to the Second Restatement, intent to benefit is ascertained by whether 'the beneficiary would be reasonable in relying upon the promise as manifesting an intention to confer a right on him. Where there is doubt whether such reliance would be reasonable, considerations of procedural convenience and other factors strictly dependent on the manifested intention of the parties may affect the question whether . . . recognition of a right in the beneficiary is appropriate.'

"As in other cases in which intention is to be ascertained, there are differences in opinion as to the kind of evidence which may be introduced and how it may be evaluated.

"Under any approach to contractual interpretation, however, the agreement itself is the primary evidence which must be examined. Thus, if the parties explicitly agree that the third party shall or shall not have an enforceable right, their express agreement on this point will be given effect. A key which unlocks

many of the cases is the determination of to whom the performance is to be rendered. If the performance is to run directly to the promisee, the third party is ordinarily an unprotected incidental beneficiary, but if it is to run to the third party, he is ordinarily an intended beneficiary with enforceable rights." Calamari & Perillo, Contracts § 17-2, pp. 607-09 (2d ed. 1977).

The Kansas Supreme Court, in *Cornwell v. Jespersen*, 238 Kan. 110, 115-16, 708 P.2d 515 (1985), quoted from *Martin v. Edwards*, 219 Kan. 466, 472-73, 548 P.2d 779 (1976):

" 'Generally, where a person makes a promise to another for the benefit of a third person, that third person may maintain an action to enforce the contract even though he had no knowledge of the contract when it was made and paid no part of the consideration (*Burton v. Larkin*, 36 Kan 246, 13 Pac. 398; *Anderson v. Rexroad*, 175 Kan. 676, 266 P.2d 320). But it is not everyone who may benefit from the performance of a contract between two other persons, or who may suffer from its nonperformance, who is permitted to enforce the contract by court action. Beneficiaries of contracts to which they are not parties have been divided into three classes: Donee beneficiaries, creditor beneficiaries, and incidental beneficiaries. Only those falling within the first two classes may enforce contracts made for their benefit (17A CJS, Contracts, § 519[4]b., p. 964; Accord: *Burton v. Larkin*, [36 Kan. 246]). These third person beneficiaries are defined in 2 Williston on Contracts, 3d ed., § 356, as follows:

" ' ". . . (1) Such person is a donee beneficiary if the purpose of the promisee in obtaining the promise of all or part of the performance thereof, is to make a gift to the beneficiary, or to confer upon him a right against the promisor to some performance neither due [nor supposed] or asserted to be due from the promisee to the beneficiary; (2) such person is a creditor beneficiary if no intention to make a gift appears from the terms of the promise, and *performance of the promise will satisfy an actual* [or supposed] or asserted *duty of the promisee to the beneficiary* [emphasis added]; (3) such person is an incidental beneficiary if the benefits to him are merely incidental to the performance of the promise and if he is neither a donee nor a creditor beneficiary." (pp. 824-827.)

" '(Accord: Restatement of the Law of Contracts, § 133, pp. 151-152. Restatement, Contracts, 2d, Revised Tentative Draft, 1973, § 133, pp. 285-286, divides contract beneficiaries into two classes—intended and incidental).' "

" 'Various tests have been used elsewhere in drawing the line between classes of beneficiaries. In *Burton v. Larkin*, [36 Kan. 246], this court held: "It is not every promise made by one to another from the performance of which a benefit may inure to a third, which gives a right of action to such third person, he being neither privy to the contract nor to the consideration. *The contract must be made for his benefit as its object, and he must be the party intended to be benefited in order to be entitled to sue upon it."* (Syl. Para. 3.) (Emphasis supplied [in *Martin*].) Under this test a beneficiary can enforce the contract if he is one who the contracting parties intended should receive a direct benefit from the contract (see anno. Contract-Enforcement by Person Benefited, 81 ALR 1271, § 111 *d.*, p. 1286). We think this test is sound and are content to reaffirm it. Contracting parties are presumed to act for themselves and therefore an intent to benefit a third person must be clearly expressed in the contract (*Ronnau v. Caravan*

*International Corporation*, 205 Kan. 154, 159, 468 P.2d 118). *It is not necessary, however, that the third party be the exclusive beneficiary of all the promisor's performance. The contract may also benefit the contracting parties as well* (17 Am. Jur. 2d, Contracts, § 306, pp. 731-732; 17A CJS, Contracts, § 519[4]f., p. 983).' (Emphasis added.)"

After citing Restatement (Second) of Contracts § 302, the *Cornwell* court set forth the test applicable in Kansas to determine the intent of contracting parties as to the rights of a third-party beneficiary:

"[W]e must apply the general rules for construction of contracts. The intention of the parties and the meaning of the contract are to be determined from the instrument itself where the terms are plain and unambiguous. *First Nat'l Bank & Trust Co. v. Lygrisse*, 231 Kan. 595, 647 P.2d 1268 (1982); *Anderson v. Rexroad*, 175 Kan. 676, 679, 266 P.2d 320 (1954)." 238 Kan. at 116.

Kansas is committed to the modern trend which requires us to apply the duty of good faith and fair dealing in every contract. *Bonanza Inc., v. McLean*, 242 Kan. 209, 222, 747 P.2d 792 (1987), states the current rule:

"The duty [of good faith and fair dealing] imposes both affirmative and negative obligations. 17 Am. Jur. 2d, Contracts § 256, pp. 653-654, states:

'Every contract implies good faith and fair dealing between the parties to it, and a duty of cooperation on the part of both parties. Accordingly, whenever the cooperation of the promisee is necessary for the performance of the promise, there is a condition implied that the cooperation will be given. Indeed, it may be said that contracts impose on the parties thereto a duty to do everything necessary to carry them out. When one undertakes to accomplish a certain result he agrees by implication to do everything to accomplish the result intended by the parties. If the giving of notice is requisite to the proper execution of a contract, a promise to give such notice will be inferred. Moreover, there is an implied undertaking in every contract on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out his part of the agreement, or do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Ordinarily if one exacts a promise from another to perform an act, the law implies a counterpromise against arbitrary or unreasonable conduct on the part of the promisee. However, essential terms of a contract on which the minds of the parties have not met cannot be supplied by the implication of good faith and fair dealing.' "

We must therefore reexamine the wording from the DSSA to determine the obligation assumed by GMC (as the promisor) and the rights granted to Beard (as the promisee). In doing this, we must not extend liability and recovery beyond our court's ability to allow redress, as enumerated in the Restatement (Second) of Contracts § 302, Comment, p. 442:

*"d. Other intended beneficiaries. . . . [I]f the beneficiary would be reasonable in relying on the promise as manifesting an intention to confer a right on him, he is an intended beneficiary. Where there is doubt whether such reliance would be reasonable, considerations of procedural convenience and other factors not strictly dependent on the manifested intention of the parties may affect the question whether under Subsection (1) recognition of a right in the beneficiary is appropriate. In some cases an overriding policy, which may be embodied in a statute, requires recognition of such a right without regard to the intention of the parties."*

Restatement (Second) of Contracts § 308 assists us in the identification of the class intended to be benefited when it states:

"§ 308. Identification of Beneficiaries
"It is not essential to the creation of a right in an intended beneficiary that he be identified when a contract containing the promise is made."

California holds "the beneficiary need not be named in the contract, he must be a member of a class referred to and identified in it." *Strauss v. Summerhays*, 157 Cal. App. 3d 806, 816, 204 Cal. Rptr. 227 (1984) (cited with approval in *Karo v. San Diego Symphony Orchestra Ass'n*, 762 F.2d 819, 822 [9th Cir. 1985]). Florida courts are stated to have long recognized the rule that a third-party beneficiary need not be named in a contract, but its status may be established by pre-contract and post-contractual actions of the parties. See *Florida Power & Light Co. v. Mid-Valley Inc.*, 763 F.2d 1316, 1321 (11th Cir. 1985).

The right of the beneficiary to enforce the duty assumed by a promisor is clear from Restatement (Second) of Contracts § 304 (1979), which states:

"§ 304. Creation of Duty to Beneficiary
"A promise in a contract creates a duty in the promisor to any intended beneficiary to perform the promise, and the intended beneficiary may enforce the duty."

GMC argues strenuously that, because it has no obligation to bestow a franchise upon the buyer of Beard's assets, the chosen party could never become an intended beneficiary. This contention totally ignores that in order to give value and establish the benefit of the sale of an automobile franchise business, GMC agreed with Beard:

*"not to arbitrarily refuse to agree to such proposal,"*
*"[to] take into account the qualifications, personal and business reputation and financial standing of the proposed dealer operator and owners,"*

*"not [to] arbitrarily refuse to agree to such proposed change or sale,"* and
*"to consider all factors requested by Dealer and base its decision on whether the proposed change is likely to result in a successful dealer operation with acceptable management and ownership which will provide satisfactory sales and service for GMC Truck customers at the approved location."*

It is apparent from the facts, viewed as we must to Noller's benefit in reviewing a motion for summary judgment (*McAlister v. Atlantic Richfield Co.*, 233 Kan. 252, 662 P.2d 1203 [1983]), that every one of the above provisions was violated by GMC. It is further clear that both Beard and GMC concluded the provisions were for the benefit of an intended class of ultimate purchasers of Beard's assets and applicants for a GMC Truck franchise. Noller fits perfectly into this classification of intended beneficiaries of the DSSA agreement.

The increase in franchising throughout Kansas and the United States requires that courts protect the parties desiring to acquire the assets of a franchisee by compelling the franchisors to act in accordance with their negotiated franchise agreements.

K.S.A. 1987 Supp. 8-2416 precludes a vehicle manufacturer from arbitrarily or unreasonably withholding approval of a proposed sale of dealer assets. Beard is given the right to seek an administrative review of the manufacturer's decision, but the statute grants no comparable right to a prospective purchaser. While the statute gives no direct claim to Noller, it appears to establish an overriding Kansas policy that approval of a written proposal of sale, transfer, or assignment is not to be arbitrarily or unreasonably withheld.

Cases from other jurisdictions are of some assistance. The Supreme Court of Minnesota, in *Culligan Soft Water Serv. v. Culligan Intern.*, 288 N.W.2d 213 (Minn. 1979), approved findings that a proposed assignee of a franchisee was qualified to assume the franchise and the franchisor's consent to the assignment was unreasonably withheld. The Tenth Circuit Court of Appeals in *Larese v. Creamland Dairies, Inc.*, 767 F.2d 716 (10th Cir. 1985), determined the Colorado courts had never addressed the question of whether a franchisor has a duty to act reasonably in deciding whether to consent to a proposed transfer. The *Larese* court determined Colorado has a requirement of "reasonableness" on consent to transfer in other types of contracts and held a franchisor lacks the absolute right to refuse to consent to the sale of a franchisee's interest to a prospective franchisee.

Third parties dealing with an automobile franchisee have the absolute right to negotiate with the franchisee for the purchase of assets with the expectation the franchisor will be required to faithfully comply with and follow the terms of an existing franchise agreement. Noller, as an "intended beneficiary" of the DSSA between Beard and GMC under Restatement (Second) of Contracts § 302 (1)(b), has a right to expect GMC to comply with its franchise agreement.

*Does Noller have a tort action against GMC for intentional interference with a contractual relationship or a prospective business advantage?*

The buy-sell contract between Noller and Beard contained an express provision making a condition precedent to performance the granting by GMC of a franchise to Noller. Noller negotiated for and obtained the right to abandon the agreement and did so when the franchise was not issued.

The fact Kansas has long recognized that a party who, without justification, induces or causes a breach of contract will be answerable for damages caused thereby (*Turner v. Halliburton Co.*, 240 Kan. 1, 12, 722 P.2d 1106 [1986]; *Vaught v. Pettyjohn & Co.*, 104 Kan. 174, 178 Pac. 623 [1919]); does not benefit Noller with his allegation of damages against GMC for intentional interference with a contractual relationship. There was no existing contract enforceable between Noller and Beard. This precludes any claim for tortious interference with an existing contact.

The court in *Turner* also recognized that a cause of action for tortious interference with a prospective business advantage or relationship exists in Kansas. The *Turner* court held:

"The requirements for this tort were recently set forth in *Maxwell v. Southwest Nat. Bank, Wichita, Kan.*, 593 F. Supp. 250, 253 (D. Kan. 1984), as: (1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate result of defendant's misconduct." 240 Kan. at 12.

Restatement (Second) of Torts § 766B (1977) states:

"One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of

"(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

"(b) preventing the other from acquiring or continuing the prospective relation."

The introductory note in the Restatement (Second) of Torts dealing with interference with contract or prospective contractual relation recognizes the law in this area has not fully congealed but is still in a formative stage. The reasons for inclusion of the word "improper" to describe the interference giving rise to a cause of action is more fully explained therein as follows:

"The word adopted for use in this Chapter, neutral enough to acquire a specialized meaning of its own for the purposes of the Chapter, is 'improper.' The several forms of the intentional tort of interference with a contractual relation are set out in §§ 766, 766A and 766B. Each of them provides that the interference must be improper. Section 767 specifies and analyzes the factors to be taken into consideration in determining whether the interference is improper, and must therefore be read and applied to each of the earlier sections. The determination of whether an interference is improper depends upon a comparative appraisal of these factors. And the decision is, whether it was improper under the circumstances—that is under the particular facts of the individual case, not in terms of rules of law or generalizations." Restatement (Second) of Torts, Ch. 37, pp. 6-7.

Prosser and Keaton on Torts § 129, p. 979 (5th Ed. 1984) states:

"Although this 'improper' interference was once described as 'malicious,' it is now clear that no actual spite has been required at all, and the term is gradually dropped from the cases, leaving a rather broad and undefined tort in which no specific conduct is proscribed and in which liability turns on the purpose for which the defendant acts, with the indistinct notion that the purposes must be considered improper in some undefined way."

Restatement (Second) of Torts § 767 (1977), which was cited with approval in *Turner*, states:

"In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

"(a) the nature of the actor's conduct,

"(b) the actor's motive,

"(c) the interests of the other with which the actor's conduct interferes,

"(d) the interests sought to be advanced by the actor,

"(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

"(f) the proximity or remoteness of the actor's conduct to the interference and

"(g) the relations between the parties."

Intertwined in this problem are the actions of GMC, which may be justified or privileged — that is, proper rather than

improper. See *Turner v. Halliburton Co.*, 240 Kan. at 13; Prosser and Keaton on Torts § 129, pp. 989-94.

Viewing Noller's evidence as we must, it is apparent a sufficient factual basis has been established to indicate totally "improper" actions on GMC's part sufficient to require submission to a jury of Noller's claim for tortious interference with a prospective business advantage. The elements of this tort, as outlined in *Maxwell* and quoted with approval in *Turner*, have been established in the following manner:

(1) Noller had an expectancy of future economic benefit;

(2) GMC had knowledge of Noller's expectancy;

(3) except for GMC's actions, Noller was reasonably certain to realize his expectancy;

(4) GMC's denial of the franchise without following the terms of its DSSA with Beard was intentional and improper; and

(5) Noller suffered damages as a direct or proximate result of GMC's misconduct.

GMC may have defenses to this claim, but there are genuine issues of material facts which remain in dispute, and entry of summary judgment on the issue of tortious interference with a prospective business advantage or relationship was inappropriate.

The case is reversed and remanded for Noller to proceed on his claim as an intended beneficiary of the GMC-Beard DSSA and on his claim against GMC for tortious interference with a prospective business advantage or relationship. The trial court's grant of summary judgment on the claim for intentional interference with a contractual relationship is affirmed.

DAVIS, J., concurring and dissenting: I concur with the majority's holding that Noller states no cause of action against GMC for tortious interference with a contractual relationship for the reasons set forth in the majority opinion and by the trial court. In all other respects, I respectfully dissent and would affirm the decision of the trial court.

### THIRD-PARTY BENEFICIARY

By holding that Noller is an intended beneficiary of the Dealer Sales and Service Agreement (DSSA) between GMC and Beard, the majority disregards settled Kansas law and the clear and unambiguous language of the agreement. Although the majority quotes at length from the Restatement (Second) of Contracts,

modern treatises on contract law, and Kansas case law, it fails to grapple with the critical issue of whether benefiting Noller or other proposed purchasers of Beard's dealership was an object of the DSSA. Instead, it bases its decision primarily on three policy grounds: (1) the duty of good faith and fair dealing in every contract; (2) the need to protect persons desiring to acquire the assets of a franchisee in the face of the "increase in franchising throughout Kansas and the United States"; and (3) "an overriding Kansas policy that approval of a written proposal of sale, transfer, or assignment is not to be arbitrarily or unreasonably withheld," which, according to the majority, is established by K.S.A. 1987 Supp. 8-2416. The majority relies upon these policies to fashion a new cause of action for would-be purchasers of an existing automobile dealership who are rejected by the franchisor:

"Third parties dealing with automobile franchisees have the *absolute right* to negotiate with the franchisee for the purchase of assets with the expectation the franchisor will be required to faithfully comply with and follow the terms of an existing franchise agreement." (Emphasis added.)

The policy grounds offered by the majority provide no basis for this unprecedented expansion of the liability of automobile franchisors. The majority's decision is certain to undermine predictability in commercial transactions, create confusion, and increase litigation.

The test in Kansas for determining whether a beneficiary may enforce a contract is well established. The contract must have as an object some benefit to a third party and that party must be the intended beneficiary. " 'Under this test a beneficiary can enforce the contract if he is one who the contracting parties intended should receive a direct benefit from the contract [citation omitted]. . . . Contracting parties are presumed to act for themselves and therefore an intent to benefit a third person must be clearly expressed in the contract [citation omitted].' " *Cornwell v. Jespersen*, 238 Kan. 110, 115-16, 708 P.2d 515 (1985) (quoting *Martin v. Edwards*, 219 Kan. 466, 473, 548 P.2d 779 [1976]); see *Fasse v. Lower Heating & Air Conditioning, Inc.*, 241 Kan. 387, 389, 736 P.2d 930 (1987).

Not unlike Kansas law, the Restatement (Second) of Contracts § 302 (1979) makes the intent of the parties as expressed in the contract the critical determinant of whether a beneficiary has a right to performance:

"§ 302. Intended and Incidental Beneficiaries

"(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

"(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

"(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

"(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary."

Although the drafters of the Restatement (Second) of Contracts chose not to employ the terms "donee" and "creditor" beneficiaries, they used the traditional classifications as a framework for § 302. Comment b to § 302 notes: "The type of beneficiary covered by Subsection (1)(a) is often referred to as a 'creditor beneficiary.'" Comment c notes that the beneficiary in subsection (1)(b) "is often referred to as a 'donee beneficiary.'" Comment d, "Other intended beneficiaries," states in part as follows:

"Either a promise to pay the promisee's debt to a beneficiary [creditor] or a gift promise [donee] involves a manifestation of intention by the promisee and promisor sufficient, in a contractual setting, to make reliance by the beneficiary both reasonable and probable. Other cases may be quite similar in this respect."

In *Cornwell v. Jespersen*, the court relied upon the traditional classifications and the Restatement (Second) of Contracts in concluding the plaintiffs were intended beneficiaries of a drilling contract:

"Clearly, if the defendants had fulfilled these duties, 'the performance of the promise [would have satisfied] an actual [or supposed] or asserted duty of the promisee to the beneficiary.' Since the defendants assumed duties owed to the plaintiffs by Quadel, the plaintiffs are creditor beneficiaries under the drilling contract and have a right to enforce the same." 238 Kan. at 118 (quoting 2 Williston on Contracts § 356 (3d ed.1959).

Noller conceded in oral argument that he is not a donee beneficiary of the DSSA. Rather, he contended below and contends on appeal that he is a creditor beneficiary. Unlike the defendants' promise in *Cornwell*, GMC's promise not to arbitrarily refuse to agree to a proposed change or sale of Beard's dealership does not satisfy " 'an actual [or supposed] or asserted duty of the promisee [Beard] to the beneficiary [Noller].' " 238 Kan. at 118.

Noller argues that GMC assumed Beard's duty to assemble the

necessary information for his approval as a franchisee. The buy-sell agreement between Beard and Noller does not expressly obligate Beard to gather information about Noller for submission to GMC. Even if Beard owed Noller such a duty, GMC did not agree to assume it. Paragraph Fourth of the DSSA states: "*Dealer agrees to provide* in the form requested and in a timely manner all applications and information customarily requested by General Motors to evaluate the proposed change or sale. General Motors agrees to consider all factors *requested by Dealer*." (Emphasis added.) The trial court properly rejected Noller's contention that he is a creditor beneficiary.

The majority opinion recognizes that Noller is neither a donee nor a creditor beneficiary, but nevertheless concludes that he is an intended beneficiary of the DSSA. In reaching this conclusion, the majority applies a "reasonable person" test advocated by Professors Calamari and Perillo:

"Would a reasonable person in the position of the promisor conclude that the promisee manifested an intention that the promisor's promised performance was sought at least in part for the benefit of the alleged beneficiary, and, assuming that the answer to the first question is in the affirmative, would a reasonable person in the position of the promisee conclude that the promisor acquiesced in the intention of the promisee?"

The obligation of this court is to follow existing Kansas law. "The construction of a written instrument is a question of law, and the instrument may be construed and its legal effect determined by an appellate court." *Kennedy & Mitchell, Inc. v. Anadarko Prod. Co.*, 243 Kan. 130, 133, 754 P.2d 803 (1988) (citing *Peterson v. Midland Nat'l Bank*, 242 Kan. 266, Syl. ¶ 1, 747 P.2d 159 [1987]). "The intention of the parties and the meaning of the contract are to be determined from the instrument itself where the terms are plain and unambiguous." *Fasse v. Lower Heating & Air Conditioning, Inc.*, 241 Kan. at 391 (citing *First Nat'l Bank & Trust Co. v. Lygrisse*, 231 Kan. 595, 647 P.2d 1268 [1982]); see *Cornwell v. Jespersen*, 238 Kan. at 116.

The DSSA clearly and unambiguously expresses the parties' intent to act only for themselves and not to benefit Noller or any other potential buyer or transferee. The DSSA provides: "*This is a personal service contract* setting forth the rights and obligations of Dealer and its approved owners and managers and of General Motors relating to the sale and service of GMC Truck

motor vehicles and related parts and accessories." (Emphasis added.) The agreement further provides: "Neither this Agreement nor any right or responsibility under this Agreement may be transferred, assigned, delegated or sold by Dealer."

Even ignoring the clear and unambiguous language of the DSSA and applying the majority's "reasonable person" test, I conclude that Noller is an incidental, not an intended, beneficiary. No reasonable person in the position of GMC would conclude that Beard manifested an intention that GMC's promised performance was sought at least in part for the benefit of Noller, nor would a reasonable person in the position of Beard conclude that GMC acquiesced in such an intention. The purpose of the DSSA was to establish a dealership for the mutual benefit of Beard and GMC. In contemplating the agreement, both parties recognized that Beard might desire to sell his assets in the future. The provisions for change of ownership benefited both parties: Beard, by increasing the value of the franchise and making his assets more readily negotiable, and GMC, by facilitating continuity of operations by another qualified dealer. In addition, GMC's promise not to arbitrarily refuse to approve a change or sale of the dealership constituted a recognition of its obligations to Beard under K.S.A. 1987 Supp. 8-2416.

Noller has failed to demonstrate any detrimental reliance on GMC's promise not to arbitrarily refuse to approve a change or sale of Beard's dealership. "The right of a third party beneficiary rests chiefly upon the fact that the contract will create reasonable expectations on his part and will induce him to change his position in reliance." 4 Corbin on Contracts § 775 (1951). Restatement (Second) of Contracts § 90 (1979) emphasizes the importance of detrimental reliance in determining whether recognition of a right to performance in the beneficiary is appropriate:

"A promise which the promisor should reasonably expect to induce action or forebearance on the part of the promisee *or a third person and which does induce such action or forebearance* is binding if injustice can be avoided only by enforcement of the promise." (Emphasis added.)

Comment c to § 90 states as follows:

"c. *Reliance by third persons.*
"If a promise is made to one party for the benefit of another, it is often foreseeable that the beneficiary will rely on the promise. *Enforcement of the promise in such cases rests upon the same basis and depends on the same factors*

*as in cases of reliance by the promisee.* Justifiable reliance by third persons who are not beneficiaries is less likely, but may sometimes reinforce the claim of the promisee or beneficiary." (Emphasis added.)

The majority provides virtually no explanation for its conclusion that Noller is an intended beneficiary of the DSSA, but simply states: "It is further clear that both Beard and GMC concluded the provisions were for the benefit of an intended class of ultimate purchasers of Beard's assets and applicants for a GMC Truck franchise. Noller fits perfectly into this classification of intended beneficiaries of the DSSA agreement." Apparently, the majority bases its conclusion on the effect of GMC's promise, which is to benefit proposed purchasers of the dealership, including Noller.

By basing its conclusion that Noller is an intended beneficiary of the DSSA on the effect of GMC's promise not to arbitrarily refuse to approve a proposed change or sale, the majority fails to confront the critical issue of whether benefiting proposed purchasers was an object of the DSSA. *Cornwell v. Jespersen,* 238 Kan. at 115. Unquestionably, GMC's performance of its promise would have benefited Noller. But this fact alone does not entitle Noller to enforce the DSSA. Rather, recognition of a right of performance in Noller must be "appropriate to effectuate the intention of the parties." Restatement (Second) of Contracts § 302(1). Otherwise, Noller is merely an incidental, not an intended, beneficiary of the agreement.

Nothing in the DSSA or in the record on appeal supports the conclusion that benefiting Noller or any other proposed purchaser was an object, rather than merely a consequence, of GMC's promise not to arbitrarily refuse to approve a change or sale of the dealership. Rather, the clear and unambiguous language of the DSSA demonstrates that the parties did not contract with the intent of benefiting a third person. Contracting parties are presumed to act for themselves absent a clear expression of intent to the contrary. *Cornwell v. Jespersen,* 238 Kan. at 116. Therefore, I conclude that Noller is an incidental, not an intended, beneficiary of the DSSA.

The majority's holding that Noller has a right to performance of the DSSA is based primarily on policy grounds. Comment d to Restatement (Second) of Contracts § 302 sanctions consideration of procedural convenience and a policy "[w]here there is doubt whether [the beneficiary's] reliance would be reasonable." The

comment states, "In some cases an overriding policy, which may be embodied in a statute, requires recognition of [a right to performance in the beneficiary] without regard to the intention of the parties."

The majority asserts that GMC's duty of good faith and fair dealing extends to Noller, that the "increase in franchising throughout Kansas and the United States" necessitates that the courts protect persons desiring to acquire the assets of a franchisee, and that K.S.A. 1987 Supp. 8-2416 establishes "an overriding Kansas policy that approval of a written proposal of sale, transfer, or assignment [of a vehicle dealer franchise] is not to be arbitrarily or unreasonably withheld." On the basis of these alleged policies, the majority boldly concludes: "Third parties dealing with an automobile franchisee have the *absolute right* to negotiate with the franchisee for the purchase of assets with the expectation the franchisor will be required to faithfully comply with and follow the terms of an existing franchise agreement." (Emphasis added.)

The majority distorts the duty of good faith and fair dealing by using it to justify its conclusion that Noller has "the absolute right" to enforce the DSSA. The duty of good faith and fair dealing arises from contract and imposes upon each party obligations to cooperate in performing the contract, and not to act intentionally or purposely to prevent the other party's performance. See *Bonanza, Inc. v. McLean*, 242 Kan. 209, 222, 747 P.2d 792 (1987). The majority's reliance on the duty of good faith and fair dealing is inappropriate because the duty assumes what the majority sets out to prove: namely, that Noller has a right to performance of the DSSA. Like GMC's promise not to arbitrarily refuse to approve a change or sale of dealership, GMC's duty of good faith and fair dealing extends to Noller only if Noller is an intended beneficiary of the DSSA. For the reasons stated above, Noller is an incidental, not an intended, beneficiary of the agreement.

The majority offers no reason why "the increase in franchising" requires special efforts by the courts to protect would-be purchasers of existing automobile dealerships. Indeed, by holding as it does, the majority substitutes its judgment for that of the legislature. In K.S.A. 1987 Supp. 8-2416, the legislature has prohibited a manufacturer or distributor of vehicles from arbi-

trarily or unreasonably withholding approval of a dealer's proposal to sell, transfer, or assign the dealer's business. The legislature, however, has extended protection only to vehicle dealers, not to potential purchasers or other transferees. Likewise, federal legislation protects only automobile dealers. See 15 U.S.C. § 1221 *et seq.* (1982). The legislature's refusal to extend statutory rights to would-be purchasers of vehicle dealerships undermines the majority's assertion that "an overriding Kansas policy" vests in Noller "the absolute right" to enforce the DSSA.

By eschewing a careful consideration of the intent of the parties to the DSSA and relying instead on policy, the majority has embarked upon an uncertain course without a fixed destination. The "absolute right" decreed by the majority subjects automobile franchisors who reject a proposed purchase of an existing dealership to unprecedented liability. An increase of litigation is certain to occur. Moreover, courts will find limiting the majority's holding to automobile franchises difficult; the policies of good faith and fair dealing and protection of persons desiring to acquire the assets of a franchisee are general enough to apply to all types of franchises. Faced with the uncertainty created by the majority opinion, franchisors will chill at the thought of doing business in Kansas.

In my opinion, the approach to third-party beneficiaries in prior Kansas case law provides certainty and predictability. Under Kansas law and the Restatement (Second) of Contracts, Noller is an incidental beneficiary of DSSA.

## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE

In *Turner v. Halliburton Co.*, 240 Kan. 1, 12, 722 P.2d 1106 (1986), the court recognized a cause of action for tortious interference with a prospective business advantage or relationship:

"The requirements for this tort were recently set forth in *Maxwell v. Southwest Nat. Bank, Wichita, Kan.*, 593 F. Supp. 250, 253 (D. Kan. 1984), as: (1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate result of defendant's misconduct." 240 Kan. at 12.

In *Turner*, the plaintiff claimed that his past employer had tortiously interfered with his relationship with a prospective

employer by informing the prospective employer that he had been terminated for theft. The central issue was whether the past employer's communications were justified.

The majority correctly points out that generally the issue of justification is a factual one. It then holds that summary judgment was inappropriate because factual questions remain about whether GMC's refusal to approve Noller as a GMC dealer was justified.

The issue of justification is material only if the plaintiff states a claim upon which relief may be granted. In this case, the trial court, relying upon Restatement (Second) of Torts § 766B (1977), concluded that the "tort only arises where there has been interference into a relationship between the plaintiff and a third person." Noller's allegation that GMC interfered with the prospective dealer agreement does not state a claim upon which relief may be granted because the agreement would have involved only GMC and Noller, not a third person.

Noller contends the trial court erred by granting summary judgment to GMC because, in addition to alleging interference with his expectancy of becoming a GMC dealer, he alleged interference with existing and prospective contractual relations with third parties, specifically with Beard (buy-sell agreement) and persons who would have become his GMC truck customers.

The provisions of the Beard-Noller buy-sell agreement negate as a matter of law Noller's claim of tortious interference with prospective business advantage. The buy-sell agreement and, thus, Noller's expectancy of future economic benefit were subject to the following condition precedent:

"The agreement [to purchase Beard's assets] is conditioned upon approval of this agreement by GMC Truck & Coach Division of General Motors Corporation, Pontiac, Michigan."

Noller had no "business relationship or expectancy with the probability of future economic benefit" without GMC's approval of the buy-sell agreement.

GMC agreed in the DSSA with Beard not to "arbitrarily refuse to agree to such proposed change or sale." Noller, however, is not an intended beneficiary of the DSSA and may not rely on the DSSA to support his tortious interference claim.

Noller's claim of tortious interference fails to state a claim upon which relief may be granted. Therefore, factual questions

regarding justification are immaterial. I would affirm the trial court's grant of summary judgment.