No. 60,437

GARY PETERSON, *Plaintiff-Appellee,* v. MIDLAND NATIONAL BANK, *Defendant-Appellant,* and MARJORIE WHARTON WELLS, and WHARTON RANCHES, INC., *Defendants-Appellees.*

(747 P.2d 159)

Opinion filed December 11, 1987.

*David C. Burns,* of Speir, Stroberg & Sizemore, of Newton, argued the cause, and *A. James Gillmore,* of the same firm, was with him on the briefs for appellant.

*Charles R. Rayl,* of Rayl and Fowler, Chartered, of Cottonwood Falls, argued the cause and was on the brief for appellee Gary Peterson.

*Don C. Krueger,* of Emporia, argued the cause and was on the brief for appellees Marjorie Wharton Wells and Wharton Ranches, Inc.

The opinion of the court was delivered by

McFARLAND, J.: This action was commenced by Gary Peterson

against defendant Midland National Bank seeking payment for hay provided to certain cattle in which Midland had a security interest. The Peterson claim was based, in part, upon foreclosure of a lien pursuant to K.S.A. 58-207. Inasmuch as this was a lien foreclosure action, the district court ordered Marjorie Wharton Wells and Wharton Ranches, Inc., brought in as additional parties defendant as they claimed liens in the same cattle. The district court ultimately found that Peterson did not have a valid lien, but awarded him a $7,236.40 judgment against Midland on the theory of unjust enrichment. The district court awarded Marjorie Wharton Wells and Wharton Ranches, Inc., a $46,000.00 judgment against Midland as foreclosure of an agister's lien (K.S.A. 58-220). Midland appeals from both judgments.

We shall first consider the issues raised relative to the Wells-Wharton Ranches judgment.

## WELLS-WHARTON RANCHES JUDGMENT

The general relevant and uncontroverted background was found by the trial court to be as follows:

"1. Marjorie Wells is a resident of the state of Texas and owns approximately 7,000 acres of Kansas real estate, individually and through a family corporation. Her husband, B. G. Wells, owns no interest in the corporation. Mrs. Wells leased from her family corporation the Kansas real estate so that she had control of the entire 7,000 acres.

"2. Mr. & Mrs. Wells entered into a written grass and agricultural lease, plaintiff's Exhibit B-4, wherein Mr. Wells leased all 7,000 acres. The lease provided for rent at the rate of $15 per acre. It had a commencement date of November 1, 1983, and extended for five years. The lease was silent as to when the rental payment was due but all the parties agree that it was to be paid in the fall of the year at the conclusion of the pasture season. This follows a commonly accepted practice in the area of paying the pasture rent at the conclusion of the pasture season which commences approximately April 1st and concludes approximately on October 31st of the same year.

"3. The lease was prepared by Mr. Kenneth Shollenbarger, the Texas attorney for Mr. and Mrs. Wells, in 1984. Although it has a commencement date of November 1, 1983, it was not signed by the parties until sometime after the first of August, 1984.

"4. Mr. Wells put approximately 460 head of cattle on the leased premises in March, 1984. The cattle were purchased with loan proceeds received from the Strong City State Bank.

"5. During this same period, the Strong City State Bank desired to sell participation in its loan to B. G. Wells to Midland National Bank because the loan exceeded its loan limits. At the end of February or the first of March, 1984, Robert

G. Wall, who manages the loan department for Midland, talked to Ray Meyer, the President of the Strong City State Bank, about the participation. Meyer informed Wall of the history of the bank's relationship with Mr. and Mrs. Wells and pointed out to him the Wells' real estate which was highlighted on a county land map located behind Meyer's desk. Meyer also showed Wall a financial statement for Mr. and Mrs. Wells, signed by Mr. Wells, indicating ownership of the real estate and a substantial net worth.

"6. Wall requested that the Strong City Bank provide him with a current financial statement indicating whether the land was owned by Mr. or Mrs. Wells or the two of them jointly. In response, Wall received from Meyer a financial statement dated March 6, 1984, indicating that B. G. Wells owned the real estate by himself and that it was valued at $1,550,000.00. The financial statements are inaccurate in that Mrs. Wells and her family corporation own the real estate. The two financial statements are shown as Defendants' Exhibits 2 and 6.

"7. Midland purchased a portion of the loan from the Strong City State Bank relying on the financial statement of Mr. Wells and the cattle at the Wells' ranch. Mr. Ray Meyer at the Strong City State Bank agreed to periodically inspect the collateral on behalf of Midland.

"8. In the fall of 1984, the loan came due, and Mr. Wells could not pay it. Midland soon discovered that Mr. Wells did not own the real estate in Chase County.

"9. Midland decided it was necessary to take over the loan directly. It proceeded to purchase the interest of Strong City State Bank."

In the fall of 1984, Mr. Wells was having serious financial problems. He could not pay the Midland loan, and he could not pay the $105,000.00 pasture rent due Mrs. Wells on November 1, 1985. He had subleased a portion of the pasture to the Wells' sons for their own cattle operation, and the sons paid their $55,500.00 portion directly to Mrs. Wells. Mrs. Wells took possession of some horses belonging to Mr. Wells for which she gave him a $3,500.00 credit. Mr. Wells' debt to Mrs. Wells was thereby reduced to $46,000.00.

Meanwhile, Mr. Wells was negotiating with Midland in an attempt to stave off the financial disaster with which he was confronted. As the trial court found:

"12. In the fall of 1984, negotiations then ensued as to how Mr. Wells' debt to Midland would be paid. Mr. Wells proposed a plan whereby the 1984 calf crop which had been born to the cattle in Kansas would be moved to pasture land he had arranged for in Texas. The cows and bulls located in Kansas would remain in Kansas for another year in order that Wells could get another calf crop from the Kansas cattle, at which point the herd would be sold and the bank would be paid off.

"13. On November 15, 1984, in connection with the refinancing, Midland

wrote Mr. Wells requesting a payment of interest, a disclaimer signed by Mrs. Wells, and a new security agreement and financing statement together with a balance sheet and profit and loss statement for Mr. Wells. Mr. Wells then consulted his attorney, Mr. Kenneth Shollenbarger, an attorney licensed to practice in the state of Texas."

On December 14, Mr. Shollenbarger wrote the following letter to Mr. Wall, Midland's Senior Vice President:

"Mr. Robert G. Wall,
Senior Vice President
Midland National Bank
P. O. Box 427
Newton, Kansas 67114-0427
"Re: Mr. B. G. Wells, Rural Route No. 1, Cottonwood Falls, Kansas 66845
"Dear Mr. Wall:
"This letter confirms our phone conversation of this morning while Mr. Wells was in my office.
"In connection with his present outstanding loan with your bank, I have enclosed the following:
"1. 11-1-84 Promissory Note in the amount of      bearing interest at maturing on 5-1-85 (executed by Mr. Wells); and
"2. Kansas Security Agreement covering Mr. Wells' Kansas property, and contract rights, and with respect to Baylor County and Knox County, Texas, locations — calves on wheat pasture in those counties (executed by Mr. Wells); and
"3. Statement or Affidavit to Midland National Bank (with respect to Mr. Wells' farming and ranching operations in Kansas) executed by Marjorie Wharton Wells; and
"4. Check No. 4977 dated 12-12-84 from Ty Jones Cattle Co., Inc. of Canyon, Texas, drawn on the First National Bank of Canyon, Texas and payable to Mr. Wells, but endorsed in favor of your bank, in the amount of $12,000.
"These documents, and these monies, are tendered to the bank as per our phone conversation, understanding, and agreement along the following lines:
"1. The Kansas Security Agreement tracks previously executed Security Agreements executed by Mr. Wells in favor of Midland National Bank, and are intended to cover the listed farm equipment, and all cattle-livestock, and related assets of Mr. Wells' farming and ranching operations in Kansas. You advised that UCC 1's have been filed with the Texas Secretary of State, and in Potter, Baylor and Knox Counties, Texas, covering only calves or cattle located in Texas, and on no other properties.
"2. In consideration of the Ty Jones Cattle Co., Inc., check, and to protect the bank's security position under the Security Agreement, the bank will make periodic advances to Mr. Wells, under new notes from time to time, covering only cattle expenses already paid to date, new pasture and grazing, trucking, and other related cattle expenses needed to mature the cattle out to the best size possible on or before the maturity date of the note.

"3. The affidavit of Mrs. Wells is intended to cover only Mr. Wells' Kansas farm and ranch operations (as Mr. Wells' separate property and estate). Such farm and ranch operations, originating in Kansas, are now, and shall at all times be, the sole, separate property and estate of Mr. Wells. The affidavit does not speak to the separate property and community property rights of Mrs. Wells with respect to Texas community property, and separate property she may own either in Texas or elsewhere.

"As we discussed by phone on several occasions, Mr. Wells wants the present cattle arrangement to work to the absolute best interests of the bank. Mr. Wells wants your bank to realize the maximum sales proceeds and revenues from the cows, calves now in pasture, and those calves which may be born prior to the maturity date of the note, giving to the bank all revenues and proceeds from this operation so that the bank will, to the maximum extent possible, be completely paid off with respect to the principal and accrued interest on the note described above.

"If we can help in any way to accomplish this, please let me know.

"Thanks again for your help.

"With best regards, I am

"Very truly yours,

/s/ Kenneth E. Shollenbarger

KENNETH E. SHOLLENBARGER"

The affidavit referred to in paragraph three of the letter is the following statement:

"DATED: 10-3-84

"STATEMENT OR AFFIDAVIT
TO
MIDLAND NATIONAL BANK
527 Main, P. O. Box 427
Newton, Kansas, 67114-0427

"By this statement or affidavit, I MARJORIE WHARTON WELLS, am disclaiming any right to manage, or own, or to have any ownership or other property or rights or interests in the farming and ranching operations of my husband, B. G. WELLS, with respect to his Kansas-based farm and ranch operations, specifically including all cattle-livestock, livestock trailer, farm tractor with front-end loader and blade, and other related or similar assets, located at his Cottonwood Falls, Kansas ranch having an address of Rural Route One, Cottonwood Falls, Kansas 66845.

/s/ Marjorie Wharton Wells

MARJORIE WHARTON WELLS"

On cross-examination of Mrs. Wells at trial, she testified:

"Q.  Is Mr. Shollenbarger your attorney?

"A.  Yes.

"Q.  Was he on December 14th, 1984?

"A.  Yes.

"Q.   Did you authorize him to send that statement or affidavit to the bank, the Defendant's Exhibit No. 1?
"A.   Yes."

On re-cross-examination, Mrs. Wells testified:

"Q.   . . . The affidavit that we've identified as deposition—Defendant's Exhibit 1, you still have it in front of you. All right. On December 14th, 1984, did Mr. Shollenbarger have authority from you to deliver that to the Midland National Bank?
"A.   He had authority from me to do whatever he deemed necessary in this situation.
"Q.   And I understand you to say he did have authority to send that; is that correct?
"A.   Yes."

After receipt of the December 14 letter from the attorney representing both Mr. and Mrs. Wells with its enclosed statement from Mrs. Wells, Midland agreed to go along with Mr. Wells' proposal to keep the cattle until spring with Midland advancing costs for the feed and care. It should be noted that Midland had a pending lawsuit (filed November 15, 1984) against Mr. Wells over his nonpayment of the loan when this agreement was made.

The district court concluded:

"5. Based upon the facts and circumstances of this action this Court must conclude that Mrs. Wells' Statement, marked Defendant's Exhibit No. 1, was not a disclaimer of lien rights in the cattle."

The district court then proceeded to determine the legal effect of arrangements between Mr. and Mrs. Wells whereby he would pay $5.00 per cow per month to keep the cows on the leased property over the winter, finding the lease did not terminate on November 1, 1984, but was modified as to "duration." The district court then held that since the lease had not terminated the requirement that lien foreclosure be commenced before December 31 pursuant to K.S.A. 58-220 was inapplicable (relying on *Hermes v. Stackley*, 10 Kan. App. 2d 342, 699 P.2d 560 [1985]). The district court ultimately allowed partial foreclosure of the lien (filed June 7, 1985) based on the $46,000 due for the 1984 pasture season. The district court disallowed that portion of the lien applicable to the $5.00 per cow per month agreement based on estoppel arising from a subsequent disclaimer affidavit by Mrs. Wells. No cross-appeal was taken from this determination.

Various claims of error are predicated upon findings of facts and conclusions of law made by the district court relative to post December 14, 1984, occurrences. We believe, however, that the issue relative to the legal effect of Defendant's Exhibit 1 (Mrs. Wells' statement) is dispositive of the issues between Midland and Wells-Wharton Ranches.

As we said in *Home State Bank v. Johnson*, 240 Kan. 417, Syl. ¶ 3, 729 P.2d 1225 (1986):

> "The construction of a written instrument is a question of law, and the instrument may be construed and its legal effect determined by an appellate court."

At the time the statement was sent to Midland (December 14, 1984), the attorney representing both Mr. and Mrs. Wells had authority from the maker to deliver it. It shows on its face that it was prepared expressly for presentation to Midland. Midland had a pending action against Mr. Wells and Mr. Wells was attempting to secure Midland's agreement to carry the cattle on until spring at Midland's expense. One must assume that Mrs. Wells, despite the separate nature of the business activities of Mr. and Mrs. Wells, had at least a mild interest in staving off her husband's pursuing creditors, else why would she have executed such a document? For convenience the statement is repeated, as follows:

> "By this statement or affidavit, *I MARJORIE WHARTON WELLS, am disclaiming any right to manage, or own, or to have any ownership or other property or rights or interests* in the farming and ranching operations of my husband, B. G. WELLS, *with respect to his Kansas-based farm and ranch operations, specifically including all cattle-livestock,* livestock trailer, farm tractor with front-end loader and blade, and other related or similar assets, located at his Cottonwood Falls, Kansas ranch having an address of Rural Route One, Cottonwood Falls, Kansas 66845.
>
> /s/ Marjorie Wharton Wells<br>MARJORIE WHARTON WELLS"

(Emphasis supplied.)

The clear intention of this broad, all-inclusive language is to assure Midland that Mrs. Wells is claiming no interest of any kind in the cattle in dispute. Midland insisted on this disclaimer before approving the proposal by Mr. Wells to carry the cattle on until spring. The instrument was intended to, and did, influence

Midland's decision relative to what to do about Mr. Wells' delinquent loan. We conclude that the district court erred in its interpretation of and legal significance ascribed to Mrs. Wells' statement. Mrs. Wells, as a result of this statement, is estopped from claiming a $46,000.00 lien interest in the cattle. The judgment herein ran in favor of both Mrs. Wells and Wharton Ranches, Inc., inasmuch as both were listed on the lien statement. Mrs. Wells was the owner or lessee from the family corporation of the entire 7,000 acres involved. No one claims that Wharton Ranches, Inc., has a greater or separate interest in the lien in question. Mrs. Wells is the real party in interest and if she is estopped to assert a lien, any rights of Wharton Ranches, Inc., also fail. The judgment against Midland in favor of Mrs. Wells and Wharton Ranches must be reversed. By virtue of this determination, other issues raised relative to the Wells-Wharton Ranches judgment need not be determined.

## PETERSON JUDGMENT

The relevant findings of fact of the district court are as follows:

"29. Midland was on notice that Mr. Wells was in financial difficulty as early as November 15, 1984, as it had filed a lawsuit against Mr. Wells. As early as November 21, 1984, Midland had discovered that the financial statements of Mr. Wells were inaccurate.

"30. Mr. Wall of Midland instructed Mr. Wells to have someone bring feed to the cattle. Based on these instructions by Mr. Wall, Mr. Wells caused Mr. Peterson to be hired to feed the cows.

"31. Midland agreed to advance funds to pay to feed and care for the cattle.

"32. Mr. Peterson was hired simply to provide and deliver hay. His job was to sell the hay; deliver it either to a designated pasture where the cows were located or the Wells barn; break the wire bands and feed it to the cows. Further, Mr. Peterson was not responsible for medicating the cows or contacting a veterinarian when they became ill. His job was merely to provide and feed the hay to the cows. His employment ended when he ran out of hay on February 9, 1985.

"33. At no time did Peterson own, lease or have possession of the pasture land where the cattle were located. He admitted that he did not have possession of the cattle but they were the responsibility of Mr. Wells.

"34. Mr. Peterson commenced delivering hay to the cows on December 13, 1985, and fed them almost daily until February 9, 1985, when he exhausted his hay supply. Mr. Peterson stated that he charged the going rate for his hay delivered in the field.

"35. Mr. Randy Wells contacted Mr. Peterson to feed the cows 100 bales of hay commencing on December 13, 1984. Mr. Peterson made up four invoices for the hay fed based upon his daily calendar notations. Mr. Peterson was paid for

the first and third invoices covering the periods December 13, 1984, to December 31, 1984, and January 16, 1985, to January 27, 1985.

"36. Moneys advanced by the Midland were used to pay for feed for the cattle including payment to Mr. Bill Thomas for protein and to Mr. Peterson for his first and third invoice.

"37. Mr. Peterson sent his first statement for his services to Mr. Wells approximately January 5, 1985, covering the period of time from December 13, 1984 to December 31, 1984. After January 15, 1985, he sent his second statement to Mr. Wells covering the period of time from January 1, 1985, to January 15, 1985. The third invoice covered the period of time from January 16, 1985, to January 27, 1985, and the final invoice covered the period of time from January 29, 1985, to February 9, 1985.

"38. Midland advanced funds for payment of feed bills in the amount of $8,661.00 by cashier's check dated February 15, 1985, payable to Murdock State Bank for the account of Mr. Wells. . . .

"39. Mr. Peterson notified Mr. Wells about one week prior to February 9, 1985, that he would not be able to feed the cows any longer because he was running out of feed.

"40. The cows secured to Midland would have died if Mr. Peterson had not fed them between December 13, 1984, and February 9, 1985. Therefore, Midland benefited from Mr. Peterson's feed and care.

. . . .

"42. In February of 1985, after he finished feeding the cattle, Peterson contacted Midland National Bank, to inquire when he would be paid. Mr. Peterson remains unpaid for 23 days or the sum of $7,236.40

"43. On June 21, 1985, over ninety (90) days past the date of the sale [of the cattle] to McCormick Grain, Mr. Peterson filed a notice of lien with the Chase County Register of Deeds. This action was instituted on July 29, 1985, in part, to foreclose this lien.

"44. In the fall of 1985 all the parties agreed the cattle pastured in Chase County, Kansas could be removed upon payment to the Clerk of the District Court of Chase County the sums of $57,500.00 and $9,270.00 by Midland and McCormick, respectively. . . . These monies were paid into the clerk's office and invested in interest bearing accounts pending resolution of this action.

"45. On August 19, 1986, Mr. Peterson was granted a default judgment against Mr. Wells in the amount of $7,236.40 with interest at the rate of 10% per annum from and since February 10, 1985, to August 4, 1986, and thereafter interest at the judgment rate plus costs."

Inasmuch as Peterson did not ever have possession of the cattle, the district court did not enforce Peterson's lien. Rather, the judgment herein was based upon unjust enrichment. In so doing, the district court concluded:

"8. A person who has been unjustly enriched at the expense of another is required to make restitution to the other. 66 Am. Jur. 2d, Restitution and Implied Contracts § 3. p. 946.

"9. While the most prevalent implied contract recognized under the doctrine of unjust enrichment is predicated upon a relationship between the parties from which the court infers an intent, the doctrine also recognizes an obligation imposed by law regardless of the intent of the parties, where good conscience dictates that under the circumstances the person benefited should make reimbursement. Unjust enrichment arises not only where an expenditure by one person adds to the property of another, but also where the expenditure saves the other from expense or loss. 66 Am. Jur. 2d, Restitution and Implied Contracts § 3, p. 946.

"10. Once jurisdiction of the subject matter has been established, the court will take into consideration all matters before it to fully adjust the rights and equities of the parties. *Place v. Place*, 207 Kan. 734, 486 P.2d 1354 (1971); *Koerner v. Custom Components, Inc.*, 4 Kan. App. 2d 113, 603 P.2d 628 (1979); *Schaefer & Associates v. Schirmer*, 3 Kan. App. 2d 114, 590 P.2d 1087 (1979).

"11. Midland realized the benefits of Mr. Peterson's feed and care for the cattle. Mr. Peterson conferred a benefit that saved others from expense and loss.

. . . .

"13. Mr. Peterson is entitled to recover the sum of $7,236.40 from the sum of $57,500.00 deposited by Midland with the Clerk of the District Court of Chase County, Kansas. Interest is to accrue at the statutory rate from the effective date of this Memorandum until paid."

Midland contends that unjust enrichment was an inappropriate theory which was improperly used to remedy a defective lien.

Restitution and unjust enrichment are modern designations for the older doctrine of quasi-contracts. *Mai v. Youtsey*, 231 Kan. 419, 423, 646 P.2d 475 (1982); *Wheat v. Finney*, 230 Kan. 217, 220, 630 P.2d 1160 (1981). One prerequisite for unjust enrichment is a benefit conferred on the defendant by the plaintiff. *Mai v. Youtsey*, 231 Kan. at 423; 17 C.J.S., Contracts § 6. The substance of an action for unjust enrichment lies in a promise implied in law that one will restore to the person entitled thereto that which in equity and good conscience belongs to him. 17 C.J.S., Contracts § 6.

In *Continental Oil Co. v. Ideal Truck Lines, Inc.*, 7 Kan. App. 2d 153, 157, 638 P.2d 954, *rev. denied* 231 Kan. 799 (1982), Justice Herd, writing for the Court of Appeals, said:

"Restitution is based on justice, morals, equity and good conscience rather than contract or statute. 66 Am. Jur. 2d, Restitution & Implied Contracts § 4, p. 946. Restatement of Restitution § 1 (1937), makes this observation: 'A person who has been unjustly enriched at the expense of another is required to make restitution to the other.' At common law the term 'restitution' was used to describe the

return or restoration of a specific thing or circumstance. It is now expanded to mean a general duty to do justice."

Of the various parties herein, Peterson is the only truly innocent person. He was caught in the complex cogs of the other parties' relationship. Mr. Wells hired him to deliver feed to the cattle because Midland told Wells it would bear the cost thereof. Midland set the wheels in motion that ran over Peterson and now attempts to avoid liability behind technical arguments on the requirements of liens and contracts. The district court was clearly correct in concluding that Midland benefited from Peterson's delivery of hay to the cattle which otherwise would have died. We conclude the doctrine of unjust enrichment is well suited for application to the factual situation herein and properly applied by the district court.

We do have a problem with the allowance of interest issue herein. The district court allowed interest at the statutory rate. Pursuant to the agreement of the parties, Midland paid $57,500.00 into court in September of 1985 and the cattle were then sold. Said money was to be held in a separate interest bearing account. The Memorandum Decision herein was entered on December 10, 1986.

The law in Kansas pertaining to post-judgment interest was clearly stated in *Bartlett v. Heersche*, 209 Kan. 369, 374, 496 P.2d 1314 (1972), where we said:

"Once a judgment debtor pays the full amount of money payable on a judgment into court, interest is not recoverable on the monies deposited in court. The general rule goes even further—when a fund of money is deposited with the court, and cannot be paid out without an order of the court, the fund will not bear interest during such time as it is within the custody of the court. *(Metropolitan Water Dist. v. Adams*, 32 C. 2d 620, 197 P.2d 543; *City of Barnsdall v. Crunutt*, 201 Okl. 508, 207 P.2d 320; and 47 C.J.S., Interest, § 54.) During such time neither party has use of the funds."

In *McGuire v. Sifers*, 235 Kan. 368, 681 P.2d 1025 (1984), we said:

"If the judgment debtor wishes to avoid the accrual of interest on appeal, he must tender the amount of the judgment or pay the amount into court." Syl. ¶ 10.

"Once a judgment debtor pays the full amount of money payable on a judgment into court, interest is not recoverable on the monies deposited in court." Syl. ¶ 11.

The judgment herein is to be paid from monies paid into court

by Midland prior to judgment. Under the circumstances herein, we deem that the judgment should have been for $7,236.40 plus that portion of the interest accrued in the interest-bearing account that is attributable to the portion of the fund awarded to Peterson.

Other issues raised by Midland relative to this judgment are considered and are held to be without merit.

## CONCLUSION

The judgment is reversed in part and affirmed in part as modified, and the case is remanded to the district court with directions to redetermine the interest allowed in accordance with this opinion.