2013 Ark.App. 259

James NEWSOM; Kevin Roberts; Mudd Creek River Farms, Inc.; Deaton River Farms, Inc.; Willoughby River Farms, Inc.; Savannah River Farms, Inc.; Riverfront Savannah Farms Partnership; and Hickory Ridge Farms, LLC, Appellants

v.

RABO AGRIFINANCE, INC., Appellee.

No. CA 12–634.

Court of Appeals of Arkansas.

April 17, 2013.

Streetman, Meeks & Gibson, PLLC, Crossett, by: Thomas S. Streetman, for appellant James E. Newsom.

Laurie A. Bridewell, for appellants.

Belew & Bell, by: John M. Belew and Steve Bell, for appellants.

Brian G. Brooks, Attorney at Law, PLLC, by: Brian G. Brooks, for appellants.

Williams & Anderson, PLC, Little Rock, by: David M. Powell and Andrew King, for appellee.

KENNETH S. HIXSON, Judge.

In this case involving priority of liens and lender liability, appellants James Newsom and Kevin Roberts each appeal from two orders of the Ashley County Circuit Court.[1] Newsom and Roberts asserted separate causes of action against appellee Rabo Agrifinance, Inc. (Rabo). Newsom argues that the court erred in

---

1. Six entities owned or operated by Roberts also filed a notice of appeal: Mudd Creek River Farms, Inc.; Deaton River Farms, Inc.; Willoughby River Farms, Inc.; Savannah River Farms, Inc.; Riverfront Savannah Farms Partnership; and Hickory Ridge Farms, LLC. We will refer to these entities only where necessary.

finding that Rabo had a valid, perfected lien in certain crop proceeds that was superior to his equitable lien. Roberts seeks reversal of ⌊₂a summary judgment entered against him on his lender-liability claim against Rabo. We affirm both orders.

## I. *Background*

Newsom was an experienced farmer with farming operations in Mississippi. Roberts was an experienced farmer with farming operations in Indiana, Louisiana, and Tennessee. Newsom and Roberts were unacquainted and neither had farmed in Arkansas. In the fall of 2009, Roberts began discussions with Rabo to obtain refinancing of the existing lines of credit on his farming operations.

Roberts and Newsom were introduced to each other by a mutual acquaintance. Despite being only recently acquainted, Newsom and Roberts orally agreed to farm approximately 5,100 acres of corn and soybeans in Ashley and Chicot Counties in Arkansas, and split the profits. They worked up a budget and determined that it would cost one million dollars to finance the venture. Newsom advised Roberts that he (Newsom) could not provide any capital but that he would provide certain labor, equipment, and expertise. Roberts agreed, and his primary part of the bargain was to provide the one million dollars in capital. Roberts was still discussing re-financing his existing line of credit with Rabo and notified Rabo that he would be conducting a farming operation in Arkansas as well as other states. Roberts requested that Rabo increase his loan application to include the money necessary to finance the new Arkansas farming operation. There is no evidence that Rabo knew of Newsom's participation in the venture.

⌊₃As the March 2010 planting season approached, Roberts had not yet secured financing from Rabo. According to Roberts, he had been assured by Rabo's relationship manager, Jim Etienne, that the loan was going to close and that he need not seek financing elsewhere. Unfortunately, while Roberts awaited Rabo's decision, it was time to prepare the soil and plant the crops in Arkansas. Despite their agreement to the contrary, Newsom began expending money to get the crops in the ground.

On April 16, 2010, Roberts and his group of companies submitted a formal loan application to Rabo seeking $5,900,000. According to the application, substantial portions of the funds were earmarked to pay existing debts unrelated to the Arkansas operation. The application referred to potential collateral as a first lien on "growing/to be grown crops, including, but not limited to corn [and] soybeans...." No specific mention was made of the Arkansas crops in the description of the collateral. However, the Arkansas operation was listed in the Business and Management Overview of the loan application.

Rabo denied the loan to Roberts on April 21, 2010. While Roberts searched for alternative financing, Newsom continued to incur expenses in planting and tending the crops. During this time, Roberts formed ABLS Crop Pro Farm Partnership for the purposes of farming the Arkansas land and allowing the venture to participate in federal Farm Service Agency (FSA) programs.[2] ABLS's principal place of business was listed as Barretville, Tennessee, but Roberts and Newsom were not listed as partners. Instead, the agreement

---

2. According to Roberts, he and Newsom individually were not eligible for the FSA pro- grams.

named four friends or associates of Roberts as partners, apparently to maintain eligibility for the government programs.

By June 2010, Roberts still had not obtained other financing. He therefore hired an attorney to demand that Rabo provide immediate financing on the ground that it had wrongfully denied the $5,900,000 loan two months earlier. The attorney informed Rabo in writing that Roberts would pursue litigation unless a "quicker and more effective resolution" could be reached. There followed approximately two weeks of negotiations between attorneys for Rabo and Roberts in which the parties went back and forth on the amount and terms of a possible loan. In early July 2010, they reached an agreement. As a result, Roberts submitted applications for a $1,472,590 loan, reflecting that the money would finance his operating expenses in Arkansas, Louisiana, Tennessee, and Indiana. The applications also contained language that Rabo would take either a "second lien" or "best lien available" on growing/to be grown crops, based on Rabo's belief that another financing company had a superior lien.

On July 9, 2010, Rabo approved the $1,472,590 loan. Roberts and his companies, including ABLS, executed credit agreements that contained clauses in which they waived and released all claims against Rabo pertaining to any acts or omissions predating the agreements. Rabo contemporaneously filed a Uniform Commercial Code (UCC) financing statement with the Arkansas Secretary of State containing a description of the collateral.

Rabo disbursed the loan money to various companies, many of which were not associated with the Arkansas venture. According to Roberts, some of the money was directed to suppliers used in the Arkansas farming operation. Even with this alleged cash infusion, however, Newsom had expended approximately $769,000 on the Arkansas crops by this point.

On July 26, 2010, Newsom filed a petition in Ashley County Circuit Court naming Roberts, ABLS, and Rabo as defendants.[3] Newsom alleged that Roberts and ABLS were liable for attempting to mortgage the crops and for failing to provide the agreed one million dollars in joint-venture capital. Newsom asked the court to impress an equitable lien on the crops for the amount of his crop-related expenses; to declare that Rabo did not have a valid lien in the crops or, alternatively, that Rabo's lien was inferior to his equitable lien; to restrain Roberts and ABLS from harvesting the crops; and to appoint a receiver to sell the crops and account for the receipts. A receiver was subsequently appointed and eventually held $885,958.30 in crop proceeds.

Rabo answered Newsom's complaint generally denying the allegations and alleged that its lien was perfected and superior to Newsom's equitable lien. Rabo also filed a cross-claim against Roberts for amounts past due on the $1,472,590 loan, asserting its security interest in the crop proceeds to satisfy the loan. Roberts filed a cross-claim against Rabo for breach of contract, promissory estoppel, deceit, economic duress, fraud, and negligent supervision based on Rabo's denial of the original $5,900,000 loan (hereafter, referred to as "the lender-liability claim").

The issues were thus joined, although Newsom's and Rabo's claims against Roberts were resolved without controversy. They obtained judgments against Roberts

3. The pleading included several other plaintiffs and defendants who are not relevant to this appeal.

for approximately $883,000 and $1,400,000 respectively. The active issues to be resolved by the circuit court were twofold: 1) who, as between Newsom and Rabo, was entitled to the crop proceeds to satisfy their respective liens; and 2) could Roberts recover against Rabo on his lender-liability claim.

Following a bench trial, the circuit court ruled that Rabo had a valid and enforceable lien on the crop proceeds, that Newsom had an equitable lien on the proceeds, and that Rabo's lien was superior. Further, the court granted summary judgment to Rabo on Roberts's lender-liability claim based on the waiver and release contained in the credit agreements. Newsom and Roberts each filed notices of appeal from the court's rulings, and this appeal followed.

## II. *Newsom's appeal*

■ Newsom argues first that Rabo's lien in the Arkansas crops was not perfected because the description of collateral in Rabo's financing statement was inadequate. The circuit court found that the description met the requirements of the UCC. We find no clear error in the court's ruling.

A secured creditor may perfect its security interest in collateral by filing a financing statement. Ark.Code Ann. § 4-9-310(a) (Supp.2011). A financing statement must contain the debtor's and secured party's names and must "indicate" the collateral. Ark.Code Ann. § 4-9-502(a) (Repl. 2001). Collateral is sufficiently indicated if it is described pursuant to Arkansas Code Annotated section 4-9-108 (Repl. 2001), or if the financing statement provides an indication that it "covers all assets or all personal property." Ark.Code Ann. § 4-9-504 (Repl.2001).

■ The basic tenet of section 4-9-108 is that a description of collateral is sufficient, whether or not it is specific, if it "reasonably identifies" what is described. A description reasonably identifies collateral if it identifies it by:

(1) specific listing;

(2) category;

(3) except as otherwise provided in subsection (e) [not applicable here], a type of collateral defined in the Uniform Commercial Code;

(4) quantity;

(5) computational or allocational formula or procedure; or

(6) except as otherwise provided in subsection (c) [not applicable here], any other method, if the identity of the collateral is objectively determinable.

Ark.Code Ann. § 4-9-108(b). Our court has interpreted "reasonably identify" to mean that the description does the job assigned to it, *i.e.*, makes possible the identification of the thing described. *First Nat'l Bank of Lewisville v. Bank of Bradley*, 80 Ark.App. 368, 96 S.W.3d 773 (2003). The law pertaining to description of collateral applies to crops as well as other types of property.[4] The adequacy of a description in a financing statement is a question of fact that will be affirmed unless clearly erroneous. *Id.*

Rabo's July 9, 2010 financing statement listed the names and addresses of the debtors, including Roberts and ABLS; listed the name and address of the creditor, Rabo; and included the following description of collateral:

ALL SOYBEAN SEED, ALL CROPS GROWN, GROWING OR TO BE

---

4. Under the previous version of the UCC, a financing statement claiming an interest in growing crops required a real-estate description of the crops. *See* Ark.Code Ann. § 4-9-402(1) (Repl.1991). The current version of the UCC eliminated that requirement.

GROWN, ALL CROP INSURANCE AND ALL RIGHTS TO PAYMENTS THEREUNDER, ALL EQUIPMENT, ALL FIXTURES, AND SUPPLIES USED OR PRODUCED IN THE FARMING OPERATION OF KEVIN ROBERTS, MUDDCREEK RIVER FARMS, INC., A TN CORPORATION, DEATON RIVER FARMS, INC., A TN CORPORATION, WILLOUGHBY RIVER FARMS, INC., A TN CORPORATION, SAVANNAH RIVER FARMS, INC., A TN CORPORATION, RIVERFRONT SAVANNAH FARMS PARTNERSHIP, A TN GENERAL PARTNERSHIP, ABLS CROP PRO FARM PARTNERSHIP, A TN GENERAL PARTNERSHIP, AND, HICKORY RIDGE FARMS, LLC, AN INLIMITED [sic] LIABILITY COMPANY WITH RESPECT TO THOSE CROP [sic] AND PRODUCTS OF THOSE CROPS IN THEIR UNMANUFACTURED STATE; SUPPORTING OBLIGATIONS [.]

▉▉▉ Newsom argues that this description could not be used to identify the Arkansas crops as collateral. While the description is broad and makes no specific mention of the site of the Arkansas crops, we agree with the circuit court that it conforms to UCC requirements. The description designates the collateral by category (crops) as permitted by section 4–9–108(b)(2). And, while it does not specifically place the crops in Ashley and Chicot Counties, such exactitude is not required under the current version of the UCC, adopted in 2001. The UCC financing statement is a bare-bones document, as evidenced by the fact that collateral may be described by simply indicating that it covers all assets or all personal property.

Ark.Code. Ann. § 4–9–504(2). Accordingly, a description of collateral need not enable a stranger to select the property—in other words, it need not be fully self-explanatory. It is sufficient if it will enable third parties, aided by inquiries that the instrument itself suggests, to identify the ₉property. *Bank of Lewisville, supra.* The onus is on the subsequent lender to seek out what information he needs. *Id.*

The financing statement in the case at bar reveals that Rabo's collateral consists of crops produced by, among others, Roberts and ABLS in their farming operations. The statement also suggests that, because it was filed in Arkansas, those crops are located on Arkansas land. This, along with the name of the secured lender, would provide a third party with sufficient inquiry notice to locate the Arkansas crops. We recognized in *Bank of Lewisville* that commentators envision an inquiring party's contacting the secured lender to obtain further information. Moreover, there is no evidence in this case that Newsom conducted an unsuccessful inquiry prior to providing funding.

Newsom argues further that an inquiry would be hampered by the fact that Rabo's initial financing statement incorrectly listed ABLS's address as Barretville, Indiana, rather than Barretville, Tennessee (Rabo made the correction in an amended filing).[5] Again, under the circumstances of this case, Newsom's ability to inquire was not affected, given his association with Roberts and his partnership in the Arkansas operation.

▉▉▉ Newsom argues next that Rabo's lien was invalid because "ABLS did not own the collateral or an interest in the collateral." Roberts, however, was listed

**5.** Newsom claims that the financing statement also incorrectly listed Roberts's address as being in Indiana rather than Arkansas. The record is not clear on whether Roberts was an Arkansas resident at the time the financing statement was filed.

as a debtor on both the security agreement and the financing statement, and he had an interest in the crops as a partner with Newsom. There was also evidence that some of the loan proceeds went into the Arkansas farming operation. We therefore see no basis for reversal on this point.

Newsom's final argument is that fairness, justice, and equity require that Rabo's UCC lien in the crop proceeds be subordinated to his equitable lien.[6] An equitable lien is a right to have a demand satisfied from a particular fund or specific property. *C.A.R. Transp. Brokerage Co., Inc. v. Seay*, 369 Ark. 354, 255 S.W.3d 445 (2007). It may arise, independently of any express agreement, by implication from the conduct or dealings of the parties. *Mitchell v. Mitchell*, 28 Ark.App. 295, 773 S.W.2d 853 (1989). In the absence of an express contract, an equitable lien may be based on equitable maxims and arise by implication out of general considerations of right and justice where, as applied to the relations of the parties and the circumstances of their dealings, there is some obligation or duty to be enforced. *See id.* However, the tendency is to limit such liens, and they will not be enforced where the circumstances present no ground for equitable relief and there is an adequate remedy at law. *Id.*

Newsom essentially contends that, if his equitable lien is not permitted to prime Rabo's lien, Rabo will be unjustly enriched. Courts in other jurisdictions have recognized that, in rare instances, an unsecured lienholder such as Newsom may prevail over a perfected, secured lienholder on grounds of equity and unjust enrichment. *See, e.g., Knox v. Phoenix Leasing, Inc.*, 29 Cal.App.4th 1357, 35 Cal.Rptr.2d 141 (1994); *Ninth Dist. Prod. Credit Ass'n v. Ed Duggan, Inc.*, 821 P.2d 788 (Colo. 1991); *Peterson v. Midland Nat'l Bank*, 242 Kan. 266, 747 P.2d 159 (1987). Those cases, however, carefully limit this equitable doctrine to situations in which the secured party engaged in egregious or fraudulent conduct, or the unsecured party, with the knowledge or participation of the secured party, made contributions that preserved the collateral. Assuming arguendo that under certain circumstances an equitable lien could prime a perfected security interest, we determine here the circuit court did not clearly err by according priority to Rabo. *Simmons First Bank of Ark. v. Bob Callahan Servs., Inc.*, 340 Ark. 692, 13 S.W.3d 570 (2000); *Feagin v. Jackson*, 2012 Ark. App. 306, 419 S.W.3d 29 (clearly erroneous standard). Rabo engaged in no egregious or fraudulent conduct. It made a loan and took a security lien on crops via a lending transaction with Roberts. It then perfected its lien under the UCC, all before becoming aware of Newsom's involvement and his desire to assert a lien. Although Newsom planted and grew the crops using his own resources, there is no evidence that Rabo participated in or encouraged Newsom's efforts, or made them necessary. To be unjustly enriched, a party must have received something of value to which he was not entitled and which he should restore. *Adkinson v. Kilgore*, 62 Ark.App. 247, 970 S.W.2d 327 (1998). Here, Rabo did as it was entitled to do under the law.

Newsom argues further that Rabo knew it could only expect a second lien on the crops. Newsom is referring to the second loan application, in which it was stated that Rabo would have a second lien or best lien available due to the claims of another cred-

---

6. The circuit court found that Newsom had an equitable lien in the crops, and Rabo does not challenge that finding on appeal. We therefore assume for purposes of this opinion that Newsom had a valid equitable lien.

itor. That creditor, however, was not Newsom. In any event, whatever Rabo's subjective expectations at the time of the loan application, its security interest was in fact first in priority in the Arkansas crops.

In light of the foregoing, we affirm the circuit court's decision to grant Rabo priority in the crop proceeds.

### III. *Roberts's Appeal*

Roberts argues that the circuit court erred in granting summary judgment on his lender-liability claim. The court ruled that Roberts's claim was precluded by the following release that Roberts signed in conjunction with his credit agreements with Rabo:

> *WAIVER OF PRIOR CLAIMS.* BORROWER WAIVES AND RELEASES ANY AND ALL CLAIMS AGAINST LENDER ... RELATING OR PERTAINING TO OR AS A RESULT OF ANY ACT OR OMISSION WHICH HAS OCCURRED PRIOR TO THE EXECUTION OF THIS AGREEMENT, INCLUDING ALL CLAIMS OF USURY, FRAUD, DECEIT, MISREPRESENTATION, UNCONSCIONABILITY, DURESS, OR LENDER LIABILITY, ANY OTHER CLAIM IN TORT OR IN CONTRACT, OR FOR VIOLATION OF ANY LAW, RULE OR REGULATION.

On appeal, Roberts does not challenge the wording of the agreement. Instead, he argues that fact questions remain as to whether the release was obtained by duress, was unconscionable, and was unsupported by consideration.

Our standard of review in summary-judgment cases is well established. Summary judgment is to be granted by the trial court only when it is clear that there are no genuine issues of material fact to be litigated and the moving party is entitled

to judgment as a matter of law. *McMullen v. Healthcare Staffing Assocs., Inc.,* 2012 Ark. App. 617, 424 S.W.3d 404. Even where there are undisputed facts, summary judgment should be denied if, under the evidence, reasonable minds might reach different conclusions from those undisputed facts. *See id.* On appeal, we determine if summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of its motion leave a material question of fact unanswered. *Id.* We view the evidence in the light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Id.*

The facts, as viewed most favorably to Roberts, reveal that Rabo's representative, Jim Etienne, indicated to Roberts that the loan documents submitted by Roberts in early 2010 looked favorable. There was also evidence that Etienne told some of Roberts's creditors that the loan would probably go through. When Rabo then declined the loan in April 2010, Roberts faced an economic crisis because the farming season was underway and finding new financing would be difficult. Even with Etienne's assistance, Roberts could not find an alternative source for funds.

In June 2010, Roberts hired attorney Cathy Nestrick to contact Rabo. On June 23, 2010, Nestrick sent Rabo a letter, reciting the history of the failed loan and stating that Roberts needed immediate funding. The letter stated in part:

> Mr. Roberts needs immediate attention to avoid a potentially devastating result which could cause all parties to participate in expensive and protracted litigation. Mr. Roberts prefers a quicker and more effective resolution than litigation, but if Rabo refuses to cooperate, Mr.

Roberts will have no choice but to pursue a lawsuit.

Thereafter, Nestrick and Rabo's in-house counsel, Linda Kobliska, began negotiating the terms and conditions of a new loan.

Emails surrounding the negotiations show that Rabo moved quickly to consider Roberts's demand. Roberts told Rabo that he was "willing to discuss the damages" and was "confident that we can come to an agreement." He also told Rabo that, if he did not get loan approval by June 30, he would walk away. He did not get approval, but negotiations continued nevertheless. Rabo proposed a loan of about $200,000 and then a loan of approximately $635,000, subject to a release of "any and all claims." Roberts rejected those amounts, though he did not voice an objection to the release. Negotiations continued.

On July 7, 2010, Roberts's attorney Nestrick sent Rabo a proposal for a loan of $1,472,590. She stated that, while the amount was not ideal, it would enable Roberts to "make it through the year" by paying specified amounts to certain creditors and suppliers. Nestrick described this loan proposal as "firm" and stated that, if Rabo were able to make the loan under those terms, Roberts would agree to sign a release of liability. Rabo accepted the proposal, and the parties entered into the credit agreements containing the release at issue.

Roberts argues first that summary judgment was inappropriate because a reasonable jury could find that the release was signed under duress. He contends that Rabo placed him in an untenable position by denying the first loan application so late in the crop year. This, he said, "backed him into a corner" and left him no alternative but to accept the reduced loan amount and sign the release.

To establish duress that will justify voiding a contract, a party must show that he involuntarily accepted the terms of the opposing party, that the circumstances permitted no other alternative, and that the circumstances resulted from coercive acts by the opposing party. *Cox v. McLaughlin*, 315 Ark. 338, 867 S.W.2d 460 (1993). The party must show more than a reluctance to accept the contract or the possibility of financial embarrassment. *Id.* He must show that the duress resulted from the other party's wrongful and oppressive conduct and not by his own necessity. *Id.* In addition, he must show that the wrongful conduct deprived him of his own free will and volition. *Id.* Duress must be shown by clear, cogent, and convincing testimony. *Sims v. First Nat'l Bank*, 267 Ark. 253, 590 S.W.2d 270 (1979).

We agree with the circuit court that the release in this case was not obtained under duress as a matter of law. Roberts was a sophisticated businessman with many years' experience in agriculture. Upon perceiving that he had a possible cause of action against Rabo, he employed counsel to initiate negotiations and threaten a lawsuit. When Rabo agreed to negotiate, both parties were represented by attorneys, and the negotiations spanned a week or more. During the negotiations, Roberts successfully increased Rabo's loan offer from $200,000 to over $1,400,000, and made the final proposal that he would sign a release if he received that amount. There is no evidence that Rabo threatened Roberts, employed coercion, or engaged in anything other than ordinary negotiations. Roberts was therefore a full participant in the negotiations, his free will was not overcome, he did not object to the release during negotiations, and he employed legal counsel to protect his interests. In these circumstances, summary judgment was appropriate.

Roberts cites several authorities in support of his claim of duress, but they are distinguishable. In *Cox, supra,* a truck driver refused to complete a delivery of goods unless the broker of the goods, McLaughlin, paid a certain amount of money. The circuit court found that, as a matter of law, McLaughlin agreed to pay the money under duress, but our supreme court reversed due to questions of fact. McLaughlin, however—unlike Roberts— did not have the benefit of counsel, did not initiate negotiations over a disputed claim, and did not have an extended period of time in which to counter the terms of Cox's demand.

Similarly, in *Totem Marine Tug & Barge, Inc. v. Alyeska Pipeline Service Co.,* 584 P.2d 15 (Alaska 1978), *Rich & Whillock, Inc. v. Ashton Dev., Inc.,* 157 Cal.App.3d 1154, 204 Cal.Rptr. 86 (1984), and *Litten v. Jonathan Logan, Inc.,* 220 Pa.Super. 274, 286 A.2d 913 (1972), all cited by Roberts, the courts found that the releases in question were executed under duress. But the signatories to those releases were either forced to waive a claim that was unquestionably owed to them but deliberately not paid, as opposed to negotiating over a disputed claim; strenuously protested the unfairness of the release under the circumstances; had no significant period of time in which to negotiate; or suffered a combination of these factors, none of which are present in the case before us. We therefore affirm the summary judgment as to duress.

■ Roberts argues next that Rabo's conduct was unconscionable and rendered the release invalid. An act is unconscionable if it affronts the sense of justice, decency, and reasonableness. *Minor v. Chase Auto Fin. Corp.,* 2010 Ark. App. 670, 2010 WL 3902754. We see no such conduct here. Rabo did not threaten Roberts, employ unusually strong bargaining power, or do anything to offend notions of justice and decency. As mentioned, the parties were engaged in attorney-driven negotiations over a disputed claim.

 Roberts also contends that the release was not supported by consideration. We disagree. As a result of a negotiated settlement, Roberts received a loan for $1,472,590 and agreed for forego any claim against Rabo based on prior acts or omissions. Consideration was therefore present. *See generally Fed. Compress & Warehouse Co. v. Hall,* 209 Ark. 274, 189 S.W.2d 922 (1945).

We affirm both the Newsom appeal and the Roberts appeal.

Affirmed.

GRUBER and VAUGHT, JJ., agree.